Patterson, J.
(of the Fifth Appellate District, sitting in place of Dunlap, J.). The plaintiff in error, Frank Colletti, the defendant below, was indicted by the grand jury of Summit county for murder in the first degree, the indictment containing three counts, the first charging in brief that on the 10th day of August, 1918, the accused shot the decedent, Frank Abruzzi, on the left side of the abdomen, which wound caused his death. The second and third counts of the indictment charged the accused with shooting said Frank Abruzzi and inflicting two mortal wounds upon his back.
The proof shows that the shooting took place about nine o’clock in the evening, near the corner of Howard and Lods streets in the city of Akron, and that the decedent after the shooting was taken to the hospital and died there that night.
The jury found the defendant guilty of murder in the first degree, with a recommendation of mercy.
A motion for a new trial was duly filed, which was overruled by the trial court, and a petition in error was filed in this court to reverse the judgment of the court below.
Many errors occurring in the trial are assigned by counsel for plaintiff in error, of which the principal ones are the four following:
1. That the defendant below was not' present when the jury viewed the premises.
2. That the alleged dying declarations of the decedent were not submitted in proper form, and were not admissible.
3. That the defendant did not have a public trial.
4. Errors in the charge of the court to the jury.
*106 With regard to the first error complained of, the record at page 2 shows that before the statements of the prosecutor and the defendant were made .the prosecutor requested that the jury view the premises. Thereupon the court inquired whether counsel for defendant “would prefer that, too,” and the reply was, “We have no objection. We join in the request.” The trial court proceeded to admonish the jury as to their duties and conduct during this view of the premises, and then inquired of counsel for the accused, “Do you want to take the defendant down, too?” To this Mr. Kimber, of counsel for the defense, replied, “No, we waive that right to take the defendant down.”
It is now contended on the part of the accused that neither he nor his counsel could waive the right of being present while the jury viewed the premises; that a view of the premises is a part of the trial and the accused must necessarily be present; and that his constitutional rights have therefore been violated, as well as his rights under Section 13676, General Code, in that this part of the trial was conducted without his presence.
Had the accused requested to be present upon a view of the premises, and the court refused this request, it would have been clearly error to have conducted this view against his objection. This is discussed in Hotelling v. State, 3 C. C., 630, the third proposition of the syllabus of which is as follows:
“Where an order *made by the court, on motion of the prosecuting attorney, under section 7283 [Revised Statutes], that the jury view the premises where the alleged crime was committed, in *107 charge of the sheriff and a person appointed by the court to point out the premises, it is error to permit such view in the absence of the accused and against his objection.”
And at pages 634 and 635 in the opinion of the above case the court say:
“The counsel for the State then moved the court for an order that the jury view the premises where it was claimed the murder had been committed; the prisoner objected, the objection was overruled, and he excepted. The court made the order that the jury be conducted to the place in a body, in charge of the sheriff and a person appointed by the court, to point out the premises; and gave instructions that no other persons should be permitted to speak to the jury upon any matter connected with the trial, while thus absent from the court room. 'The view was had, and the jury returned. This objection and exception is assigned for error. Sec. 7283 [Revised Statutes] provides that whenever in ■the opinion of the court it is proper for the jurors to have a view of the place at which any material fact occurred, it may order them to be conducted in a body, under the charge of the sheriff, to the place which shall be shown to them by some person appointed by the court. And while the jurors are thus absent, no person other than the sheriff having them in charge, and the person appointed to show them the place, shall speak- to them on any subject connected with the trial. Counsel for the prisoner contends that this section of. the statutes is in violation of Sec. 10, Art. 1, of the constitution, which provides that ‘in any trial in any court, the party accused shall be allowed to appear and *108 defend in person and with counsel; to demand the nature and cause of the accusation against him; to have a copy thereof, and to meet the witnesses face to face.’
“We do not think it necessary to pass upon txie question whether this statute is in violation of the constitution, unless its operation would necessarily preclude the accused from being present during the view of the premises. This it does not do. There is nothing to prevent him from being present, if permitted by the court, unless he would voluntarily waive such right. It is not only his constitutional right to be present during the trial, but Sec. 7301 of the statute provides among other things ‘that he shall not be tried unless personally present.’ If the view of the premises was a part of the trial, it is certain he should have been present when the view was had.”
In the above case it will be noted that the accused was not allowed the privilege of being present during the view of the premises by the jury, and that he duly excepted to his deprivation of this privilege. The record in this case shows no desire upon the part of the accused to be present at this view of the premises; he expressly waives his right to be present, and no exception is filed thereto. This would bring him under the rule laid down in Blythe v. The State, 47 Ohio St., 234, in which case the entire opinion per curiam is as follows:
“A view of the place where the homicide occurred is expressly authorized by section 7283, Revised Statutes, which makes no provision for the defendant on trial to accompany the jury when it is made. Section 7301, Revised Stat *109 utes, prescribes that, except in cases of misdemeanors, no one charged with an offense shall be tried in his absence.
“This section does not require the actual presence of the accused in court at all times during his trial, but prescribes that one out of the jurisdiction or control of the court can not be tried for a felony, and notwithstanding this section (7301, Revised Statutes), one on trial for a felony and not in actual custody may pass in and out of the courtroom, and remain absent for considerable periods of time, without rendering the progress of the trial during his absence erroneous. Therefore, if a view such as is authorized by section 7283, Revised Statutes, be a part of the trial within the meaning of section 7301, Revised Statutes, yet, as the court of common pleas expressly granted to plaintiff in error, permission to accompany the jury when the view was taken, which privilege, under advice of counsel he declined to accept, he must be deemed to have voluntarily absented himself, and thereby waived his right and privilege to be present when the view was taken. The court of common pleas, having granted him the privilege to accompany the jury, was not bound to compel him to accept it.”
It is clearly the established law in Ohio that the accused has the right to be present at such view of the premises, and it is error to deprive him of the right to be there if he so desires. On the other hand, it is equally clear that he may refuse to accompany the jury, that he may waive the right to be present. In either event, refusal to be present or a waiver of his right to he presen^ there is no error.
*110 The entire testimony with reference to the question of the dying declarations of the decedent will Ibe found upon pages 12 and 13 of the record, and the record in full upon this question is as follows:
“Q. Where did you see your husband? A. At the hospital.
“Q. And did he say anything to you at the hospital? A. Yes, sir.
“Q. What did he say to you ?
“Mr. Kimber: I object.
“Mr. Laybourne: What did he say to you at the hospital ?
“Mr. Kimber: I object to the question.
“The Court: You claim this is a dying declaration?
“Mr. Laybourne: Yes.
“Mr. Spencer: We will qualify this as a dying declaration.
“The Court: Will you show he believed he was in a dying condition?
“Mr. Spencer: Yes; that he realized he was dying and died a moment afterwards.
“Mr. Kimber: I still say it is objectionable. That must be shown first in this kind of a case.
“Mr. Spencer: It’s all in this conversation, as to what he said about dying.
“The Court: You may answer and we will see whether it is competent or not.
“Defendant excepts.
“A. I said to him: ‘Bernardino, who wounded you? Who hurt you?’ He said: ‘Frank Colletti.’
“Defendant asks to have answer excluded. Answer allowed to stand. Defendant excepts.
*111 “Mr. Laybourne: Q. What else did he say? A. He said: ‘When I got near him he shot me without any talk or anything.’ Defendant objects to the answer and asks that it be excluded. Answer allowed to stand. Defendant excepts. ‘He told me to send him to the electric chair.’ Defendant asks to have the answer excluded. Answer allowed to stand. Defendant excepts. ‘He sent for me at my house to assassinate me. Good-bye. I am dying.’
“Mr. Kimber: I ask to exclude this last part of the answer.
“The Court: It may stand. Defendant excepts.
“Mr. Kimber: And I ask to have all of the answer excluded now.
“The Court: No, I think the last answer qualifies the rest of it now. Defendant excepts.”
In his twelfth ground in the motion for a new trial the accused complains of “errors of law and abuse of discretion in the admission of evidence as to a so-called dying declaration.” In 1 Ruling Case Law, at page 527, dying declarations are defined as follows:
“In its broadest meaning a dying declaration is a statement made by a person under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately. However, in the sense in which it is now used in law, a dying declaration is a statement made by a victim of a homicide while in articulo mortis and without hope of recovery, concerning the facts and circumstances under which the fatal injury was inflicted, where the statement is offered in evidence on the trial of the person charged with having caused the death of the declarant.”
*112 Dying declarations may be proven by any competent witness, and may be proven by the declarant’s wife if she is a competent witness. The statements of the decedent should be limited to the res gestae. 1 Ruling Case Law, page 534:
“When it is remembered that by the admission in evidence of dying declarations the defendant is deprived of being brought face to face with the witness and of the benefits of cross-examination, and the declarant’s statements are admitted without reference to the form of the questions to which they are responsive, which, in many instances, are leading as well as misleading to one in a weakened and dying condition, the protection of the liberties of the innocent, as well as in many cases the conviction of the guilty, demands that statements admitted under such circumstances be limited to the res gestae, and that the deceased be permitted to speak only of the transactions causing the death, with such accompanying* statements and conduct as may throw light upon it. Dying declarations are, however, always admissible for the purpose of identifying the person who committed the crime.”.
Each and all of the answers and questions with reference to the alleged dying declarations are excepted to upon the part of the accused and great stress in the argument of counsel is laid upon the answer, “He told me to send him to the electric chair.” That this was not properly a dying declaration, but showed rather a spirit of revenge. But it would seem that another view might be taken of this answer, because if the injured man were not dying, and did not feel that he was then in ex-tremis, the accused could not be sent to the electric *113 chair, because there would be no murder. Objection is also made to the answer, “When I got near him he shot me without any talk or anything.” And it is claimed that this is not a part of the res gestae.
Declarations that are merely matters of opinion are not incompetent. In the case of Wroe v. State, 20 Ohio St., 460, the third proposition of the syllabus is as follows:
“In making a dying declaration, the declarant, in speaking of the fatal wound, said it was done without any provocation on his part. Held, that this declaration was not incompetent as being mere matter of opinion.”
Objection is also made to the form in which the alleged dying declarations were received. It being claimed that the court should have examined the widow without the presence of the jury, to see whether these declarations were admissible as dying declarations, and, if the court so found, that then the jury should be recalled and the evidence given to them; and, if not found to be competent by the court, that the jury, in that event, should not hear any of the purported evidence upon this line. Counsel for the state, however, claim that these were dying declarations, that the trial court found that they were, and that if the court so found there could be no error in their admission in the manner in which they were introduced. The last words, “Good-bye. I am dying,” would certainly show that the decedent himself thought that he was in extremis, and if he so thought, and in fact was in a dying condition, and shortly thereafter did die, the alleged dying declarations were *114 admissible and properly submitted to the jury for their consideration along with the rest of the evidence in the case.
It is further contended on the part of the plain- . tiff in error that he was deprived of the right of a public trial as guaranteed him by the constitution, and page 231 of the record shows that the following proceedings were had with reference to the conduct of the trial:
“The Court: This morning the court made an order that no person should be permitted in the court room excepting the witness on the witness . stand, the members of the bar, the officers of the court and the defendant and attorneys in the case, and the jurors and the newspaper men, on account of the health conditions that prevail. The court had no conference with counsel before it made that order and has just taken it up with counsel, and counsel on both sides agree that is the order that should go on, and with their consent the court will enforce that order rigidly.
“Mr. Kimber: I would say in that connection, your Honor, the only man we would like is an interpreter, this gentleman that has been here.
“The Court: You may permit him to remain.”
It will be observed that on account of health conditions the trial court made this order without consulting either the state or the defense, and that some little time after making the order the court took the matter up with counsel, and the record shows that counsel on both sides agreed that the above order should go on and that with their consent the court should enforce the order. Thereupon counsel for the plaintiff in error requested *115 that the interpreter be allowed to remain, which accordingly was done.
It is contended on the part of the plaintiff in error that neither he nor his counsel could waive the constitutional right to a public trial, and in support of this contention counsel cite the Constitution of Ohio, Article I, Section 10; the Federal Constitution, the 6th and 14th Amendments; also Davis et al. v. United States, 247 Fed. Rep., 394; and, further, the case of State v. Hensley, 75 Ohio St., 255.
In the case last cited the proceedings had are set forth as follows, at page 261:
“After the examination of the first witness, on the reassembling of court after the noon adjournment, the first day of the trial, the court announced that in view of the testimony expected to be given by the next witness he would continue the trial during the taking of the testimony of witnesses likely to give immoral or obscene testimony in the small court room, the probate court room, and directed the sheriff to admit no one to said room except the jury, defendant’s counsel, members of the bar, newspaper men, and Grimes, defendant’s witness. The order was made in open court in the presence and hearing of defendant and his counsel. No objection was made other than the statement by one of the defendant’s counsel that the defense knew of no testimony that would be improper to be heard in a public trial. Thereupon the trial was transferred to the small room, and the judge, the jury, defendant, his counsel, a number of the bar and newspaper men, and the witness Grimes, went to the small room, where the court *116 was opened and by order of the court the general public was excluded during the taking of the testimony by the state in chief, and in reply or rebuttal, save as to one witness, a physician.”
At page 263, in the same opinion, the court quote from Cooley’s Constitutional Limitations (6 ed.), 379:
“It is also requisite that the trial be public. By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials; because there are many cases where, from the character of the charge and the nature of the evidence by which it is to be supported, the motives to attend the trial on the part of portions of the community would be of the worst character, and where a regard to public morals and public decency would require that at least the young be excluded from hearing and witnessing the evidences of human depravity which the trial must necessarily bring to light. The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether.”
The court further discuss the question of a public trial, at pages 265 and 266:
*117 “It is not intended here to indicate that the trial judge is without power to exclude from the court room during the trial of a criminal case individuals, though adults, who are, by reason of habits or physical condition, personally obnoxious, or persons who by their conduct interrupt the orderly course of business, or the power to clear the room of general spectators who, as in Grimmett v. The State, 22 Texas App., 36, were so boisterous and insubordinate as to intimidate witnesses, and where it was impossible to distinguish those who participated from those who did not; nor is it doubted that persons whose attendance is for the express and only purpose of using the information thus obtained in a way calculated to directly obstruct the administration of justice may be excluded. Perhaps, too, the character known as the ‘court room loafer/ whose attendance would be induced only by prurient curiosity, might be excluded without harm to the defendant, or prejudice to the state, although the matter of determining with certainty just who should, and who should not, be included in this category in the given instance, might not always be easy of solution. Much should be, and we think is, necessarily and properly left to the trial judge, who is obliged to insist upon the orderly conduct of the public business, and whose highest duty is the securing to the parties, the defendant as well as the state, a fair and impartial trial; but the people have the right to know what is being done in their courts, and free observation and the utmost freedom of discussion of the proceedings of public tribunals that is consistent with truth and decency tends to the public welfare. We agree *118 with the holding of the circuit court in the case at bar that the order of exclusion was too general in character and its limitations of admission too restrictive, and that the defendant was not accorded such a public trial as is guaranteed by the constitution.
“It is, however, insisted by counsel for the state that because no specific objection or exception was entered by the defendant at the time the order was made or was being enforced, the error, if any was committed, can not now be taken advantage of. This objection ignores the force and effect of the constitutional provision. The right to a public trial is guaranteed. It is of the same high order of right as the other guarantees embodied in the section: that to appear and defend in person and with counsel; that to meet the witnesses face to face and have compulsory process, and that to a trial by jury. The right can not be waived by silence any more than can the right to be tried by jury where the accusation is a felony and the plea is not guilty.”
It will be observed that in the above case the defendant did not agree to the adjournment of the court to a small room and the exclusion of the general public, but simply remained silent, unless the statement of counsel that he knew of no such testimony should be considered as an objection.
In the case at bar the trial court, upon his own motion, recognized the fact that there was prevalent in the country and in the city an epidemic of Spanish influenza, and any power that the trial' court should have to exclude the general public *119 from the trial or to prevent the assemblage of a large number of people on account of the then prevailing epidemic would arise by virtue of the police power. In 6 Ruling Case Law, at page 183, the nature of police power is defined as follows:
“Nature of Police Power. — The police power is an attribute of sovereignty, possessed by every sovereign state, and is a necessary attribute of every civilized government. It is inherent in the states of the American Union and is not a grant derived from or under any written constitution. It has been said that the very existence of government depends on it, as well as the security of social order, the life and health of the citizen, and the enjoyment of private and social life and the beneficial use of property. It has been described as the most essential, at times the most insistent, and always one of the least limitable of the powers of government.
“Difficulty of definition. — While there have been many attempts to define the police power, it has not yet received a full and complete definition. The difficulty has been frequently commented on, and it has been said that the police power is from its nature incapable of any exact definition or limitation, because none can foresee the ever-changing conditions which may call for its exercise. The boundary line which divides the police power of the state from the other functions of government is often difficult to discern, and the limitations of the power have never been drawn with exactness. It has been said repeatedly that it is much easier to perceive and realize the existence and sources of *120 this power, than to mark its boundaries, or prescribe limits to its exercise.”
On page 189 in the same work police power is further discussed as follows:
“Plasticity of police power. — The police power of the state, never having been exactly defined or circumscribed by fixed limits, is considered as being capable of development and modification within certain limits, so that the powers of governmental control may be adequate to meet changing social, economic, and political conditions. It is very broad and comprehensive, and is liberally understood and applied. The changing conditions of society may make it imperative for the state to exercise additional powers, and the welfare of society may demand that the state should assume such powers.” On page 193 there is the following on the subject:
“Where appellate courts are called on to determine the validity of police regulations they frequently incline towards acquiescing in the opinion of local tribunals and bodies, because the latter are familiar with local conditions and are in a better position to judge of the necessity of such enactments. Considerable latitude is sometimes allowed for possible peculiar conditions as to which the appellate court may have but little knowledge.”
And also on page 195 as follows:
“Constitutional rights as limiting police power.
—A police regulation, obviously intended as such, and not operating unreasonably beyond the occasions of its enactment, is not rendered invalid by the fact that it may affect incidentally the exercise of some right guaranteed by the constitution.”
*121 The police power has been referred to in a great many Ohio decisions and we will refer to only a few of them.
In Phillips v. State, 71 Ohio St., 214, at page 216, the court say:
“It is almost an axiom that anything which is reasonable and necessary to secure the peace, safety, morals and best interests of the commonwealth may be done under the police power; and this implies that private rights exist subject to the public welfare.”
In Mirick v. Gims, Treas., 19 Ohio St., 174, at page 178, the court say:
“The police power is an attribute of sovereignty and has its origin, purpose and scope in the general welfare, or as it is often expressed, the public safety, public health and public morals. These terms indicate its field, yet its boundaries are necessarily vague and indefinable.”
The question is further discussed in the case of State v. Boone, 84 Ohio St., 346, at page 351:
“The police power is inherent in sovereignty; and its exercise is justified by the necessity of the occasion. Its foundation is the right and duty of the government to provide for the common welfare of the governed. It is tersely expressed in the maxim, ‘Salus populi suprema lex.’ ”
And in the case of Toledo Disposal Co. v. State, 89 Ohio St., 230, the first proposition of the syllabus is:
“In the exercise of the police power, the state and municipal authorities may make all such provisions as are reasonable, necessary and appropriate for the protection of the public health and com *122 fort, and when any such provision has a real and substantial relation to that object and does not interfere with the enjoyment of private rights beyond the necessities of the situation, every intendment is to be made in favor of its lawfulness.”
It is recognized that the accused is entitled to a public trial, and that the trial of criminals and their punishment has a twofold effect: not only to punish the one convicted, but that his trial and punishment may deter others from committing similar offenses, so that the accused and the public, in a sense, are interested in a public trial.
In the case at bar the trial court familiar with local conditions took the view under the prevalence of an epidemic that the public health and welfare, not only of the spectators themselves, but of the court, officers and jury as well, required that there ¡be no assemblage of the people at that time in the court room. We are all familiar with the fact that at and about this time schools and churches were closed, the right of public assemblage was prohibited to the people and these were all necessary police regulations designed to stamp out the further extension of the then existing epidemic. In this respect the case at bar differs from the authorities cited. No authority has been cited to us rais-' ing the question of the right of the court to exclude the general public from the court room in case of an epidemic such as existed at or about the time of this trial. And we are inclined to the view that the court acting for the general public welfare exercised his privilege, and that it was his duty for the promotion of public health and welfare to proceed with the trial as he did. And it is evident *123 from the record that the counsel for the accused recognized that these conditions existed and consented to the further exclusion of the public from the trial, and that there was no error prejudicial to the plaintiff in error in thus excluding them.
It is insisted by counsel in their brief and also in oral argument that the words “beyond all reasonable doubt” should have been used in the charge of the court instead of the words “beyond a reasonable doubt.” No authority is cited to us showing wherein the word all has ever been used in this connection, and an examination of the reported cases in Ohio discloses the fact that the words “a reasonable doubt” are used in the following cases: Clark v. State, 12 Ohio, 483; Farrar v. State, 2 Ohio St., 54; Adams v. State, 31 Ohio St., 462; Morehead v. State, 34 Ohio St., 212; Morgan v. State, 48 Ohio St., 371; McGuire v. State, 3 C. C., 551, 2 O. C. D., 318; Breck v. State, 4 C. C., 160, 2 O. C. D., 477; Ditzler v. State, 4 C. C., 551, 2 O. C. D., 702; Altschul v. State, 8 C. C., 214, 4 O. C. D., 402; Neifeld v. State, 3 C. C., N. S., 551, 13 O. C. D., 246; Lindsey v. State, 69 Ohio St., 215; State v. Schiller, 70 Ohio St., 1; Hutchinson v. State, 8 C. C., N. S., 313, 18 O. C. D., 595; Ryan v. State, 10 C. C., N. S., 497, 20 O. C. D., 306, and Wray v. State, 5 C. C., N. S., 437, 17 O. C. D., 1.
The term “beyond a reasonable doubt” is also used in Section 12399, General Code, being the section which defines murder in the first degree.
In the light of these authorities had the word ({all” been used before “reasonable doubt,” we think it would have been error in the charge of *124 which the state would have had just right to complain, and that there was no error in the charge as given with reference to the degree of proof required in a criminal case, namely, beyond a reasonable doubt.
Further complaint is made that the court erred in not charging the jury with reference to the alleged dying declarations admitted in evidence in the case. The record does not show any special request for such a charge by the counsel for plaintiff in error, and it was admitted in the argument that no special request as to this evidence was made to the court. In regard to this contention we think the rule is well established that counsel for the plaintiff in error can not complain of the omission of the court to charge in this respect when no request for the same was made at the time of the trial. The rule is aptly stated in the case of State v. Schiller, 70 Ohio St., 1, where at page 8 the court say:
“No request was made by defendant, or his counsel, for any further or additional charge on this subject, and no objection was made or exception taken to this particular portion of the charge as given. The only exception taken or noted by counsel for defendant, being a general exception to the charge as* a whole. It is a familiar and very general rule of practice, applicable alike to criminal and civil causes, that mere partial non-direction, or incomplete instruction, as to a particular matter or issue, does not of itself constitute reversible error, in the absence of a request for more specific and comprehensive instructions upon the particular point or issue involved.”
*125 We have examined the entire charge of the court and think that in his charge the court stated the law correctly and that there were no errors in it prejudicial to the rights of the plaintiff in error.
This disposes of the principal contentions made on behalf of the plaintiff in error. Many other errors are assigned, but we have examined the entire record and find no errors therein prejudicial to the rights of the plaintiff in error, and the judgment of the court of common pleas is therefore affirmed.
Judgment affirmed. *126 This is a proceeding in error
*125 Washburn and Vickery, JJ., concur.