COMMONWEALTH vs. HERDIUS EVANS
(and five companion cases[1]).

Suffolk. September 9, 2002. - November 21, 2002.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Joint Enterprise. Identification. Jury and Jurors. Witness,*
Unavailability. *Practice, Criminal,* Jury and jurors, View, Instructions to
jury, Capital case. *Constitutional Law,* Trial by jury. *Evidence,* Relevancy
and materiality, Hearsay, Expert opinion, Spontaneous utterance, Declara-
tion against interest, Past recollection recorded, Prior inconsistent
statement.

At a criminal trial, the evidence was sufficient to permit the jury to find a
codefendant guilty of murder in the first degree, armed robbery, and armed
assault with intent to rob one of two victims, and consequently, the
codefendant's motion for a required finding of not guilty as to those crimes
was properly denied. [147-148]

The judge at a criminal trial properly excused each of the ten college students
on the venire of jurors on the basis of hardship based on individual
circumstances and not on the basis of any policy; moreover, the decision in
each instance was within the judge's discretion under G. L. c. 234A, § 40
(trial lasting more than three days may be ground to excuse juror for hard-
ship); further, the students did not constitute a "distinctive group" who
were systematically excluded from the venire, in violation of the fair cross
section requirement of the Sixth Amendment to the United States Constitu-
tion, nor was it shown that college students became significantly under-
represented in the venire as a result of the loss of the students to hardship.
[148-150]

A criminal defendant's rights under the Fourteenth Amendment to the United
States Constitution and art. 12 of the Massachusetts Declaration of Rights
were not violated when a judge denied the defendant's request to attend
the jury's view of various streets in the area of the alleged crimes that
would be discussed in testimony, where the defendant failed to meet his
burden of showing that his exclusion from the jury view denied him a fair
trial. [150-151]

At a criminal trial, there was no error in the judge's admission in evidence of
a mask found in the possession of one codefendant even though there was
no evidence that a mask had been used in the crime, where the mask was
relevant to show that that defendant had the intent and means to commit
the crime, and where the other defendant failed to show any substantial
prejudice. [151-152]

[1]Three against James Ware and two against Herdius Evans.

At a criminal trial, the admission of certain unobjected-to hearsay evidence through an expert witness did not create a substantial likelihood of a miscarriage of justice. [152-153]

At a criminal trial, there was no error in the judge's admission of evidence that defense experts witnessed deoxyribonucleic acid (DNA) testing done by Commonwealth experts, and that an expert observer could have detected any errors in the testing procedures, where the evidence was properly offered to bolster the credibility of the Commonwealth's DNA experts after the reliability of the DNA tests had been challenged on cross-examination. [153-154]

At a criminal trial, there was no error in the judge's exclusion of negative identification evidence, offered under the spontaneous utterance exception to the hearsay rule [154], and under the rule in *Chambers* v. *Mississippi*, 410 U.S. 284, 302 (1973) [155-156].

At a criminal trial, the judge properly declined to admit, under the "past recollection recorded" exception to the hearsay rule, a memorandum prepared by an assistant district attorney concerning a conversation he had with a police detective, offered to impeach another Commonwealth witness, where the defendant failed to show that the assistant district attorney had no revivable recollection of the subject of the memorandum, and that the memorandum was created when the events were still fresh in his memory. [156-157]

Criminal defendants failed to meet their burden of showing that the judge at their trial for murder and other crimes committed palpable error by excluding "consciousness of innocence" evidence that one defendant continued to live at home while released on bail. [157]

At a criminal trial, the judge did not err in failing to instruct the jury to give separate consideration to the evidence against each of the two codefendants, where the judge's instructions in their entirety adequately conveyed to the jury that the Commonwealth's burden was to prove guilt individually. [157-158]

INDICTMENTS found and returned in the Superior Court Department, two on on May 17, 1993, and four on August 27, 1993, respectively.

The cases were tried before *Thomas E. Connolly*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Bruce R. Bono*, Committee for Public Counsel Services, & *Larry R. Tipton* with him) for Herdius Evans.

*James L. Sultan* for James Ware.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendants, Herdius Evans and James Ware, were convicted of the murder in the first degree of Allan Lawrence Hill on theories of extreme atrocity or cruelty and felony-murder. They were also convicted of armed robbery and

armed assault with intent to rob Hill, armed assault with intent to rob Peter Wattles, and assault and battery on Wattles.[2] On appeal, Ware alleges error in (1) the denial of his motion for a required finding of not guilty as to the indictments alleging crimes against Hill; (2) the denial of his motion to attend the view; and (3) the judge's failure to instruct the jury to give separate consideration to the evidence against each defendant. Both defendants allege error in (1) the exclusion of college students from the venire of jurors; (2) the admission in evidence of a mask found on Ware absent any evidence that a mask had been used; (3) the admission of hearsay evidence through an expert witness; (4) the admission of evidence that defense experts witnessed deoxyribonucleic acid (DNA) testing done by Commonwealth experts; (5) the exclusion of negative identification evidence; (6) the exclusion of a report by an assistant district attorney under the "past recollection recorded" exception to the hearsay rule, offered to impeach another Commonwealth witness; and (7) the exclusion of evidence of consciousness of innocence.[3] We affirm the convictions, and decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt on the murder verdicts or order a new trial.

1. *Facts.* The jury could have found the following facts. Shortly before 9 P.M. on May 6, 1993, Peter Wattles was walking through Sparrow Park in the South End section of Boston en route to his apartment on West Rutland Square. He passed by Evans and Ware, who were sitting on a park bench. They got up and followed him. Sensing that they were behind him, Wattles walked faster, but the defendants kept pace.

Wattles climbed the stairs to his apartment house and went to unlock the outer door. Ware, who stood just below him on the stoop, punched him in the head. Evans, who was taller and thinner than Ware, pointed a knife at Wattles and demanded his

---

[2] The convictions of assault and battery on Wattles and armed assault with intent to rob Hill were placed on file with the defendants' consent and are not before us on appeal. See *Commonwealth* v. *Ortiz*, 431 Mass. 134, 135 n.1 (2000).

[3] A claim of error surrounding the announcement of one of the jury's verdicts has been withdrawn following the correction of an error in the transcript, pursuant to Mass. R. A. P. 8 (e), as amended, 378 Mass. 932 (1979).

money. Wattles got a good look at both men from their position at the well-lit entrance. He produced his wallet and Ware punched him in the head a second time. Wattles lowered his wallet, fanning approximately $300 in front of them. As Evans and Ware were looking down at the money, Wattles jumped from the top step and fled. The defendants chased him as far as Columbus Avenue, a busy and well-lit street in the South End. Wattles crossed Columbus Avenue and went into a restaurant. After taking no more than five minutes to compose himself, Wattles telephoned the police.

While Wattles was inside the restaurant, Allan Hill, a student at the New England Conservatory of Music, left his apartment at 316 West Newton Street, near Sparrow Park, to return some bottles for deposit at a nearby liquor store on Columbus Avenue. He was attacked by two men near Sparrow Park, both of whom were pummeling him as he lay on the ground. The two men then fled down West Newton Street toward Columbus Avenue. Hill got up, then shakily crossed West Newton Street before collapsing from two stab wounds, one to the chest and one to the abdomen. An ambulance and several police cars arrived shortly. Hill was taken to a hospital, where he underwent extensive surgery.

Eyewitnesses described Hill's assailants as two African-American males, one of whom was taller and thinner than the other. The shorter and stockier of the two wore a whitish colored shirt with short sleeves that reached his forearms. One eyewitness had reported that the shirt of one of the assailants had been ripped off. One of the officers who first responded at the scene where Hill lay in the street followed a trail of blood across West Newton Street, where he found a wallet, Hill's identification and credit cards, and a piece of dark blue cloth that appeared to be the collar of a T-shirt.

Wattles, who waited for officers outside the restaurant, heard the sirens of emergency vehicles responding to the Hill incident. Two officers in a marked cruiser picked him up within minutes of his telephone call. He told them what happened, and they drove him around the neighborhood to see whether he could identify his assailants, on the chance that they were still in the area. After about ten minutes, Wattles spotted the defendants

walking together on West Newton Street. He indicated that they looked like the men who attacked him. As the cruiser approached, Ware started walking across the street. The cruiser stopped. One officer got out and asked to speak to Ware. Ware fled, but the officer caught him in an alley about one block away.

Evans also fled, in the opposite direction. The second officer pursued him down Newland Street in the cruiser. Evans ran through several yards, vaulting three eight-foot fences along the way. He ran down several streets before stopping and blending into a crowd of people. The officer spotted him. As the officer approached, Evans threw a knife into a nearby yard. He was handcuffed, and the knife was recovered.

Immediately after their arrest, Evans and Ware, separately, were brought to Wattles, who positively identified both men as his assailants. The defendants were then taken to the location on West Newton Street where Hill had collapsed. There, one witness identified them as having the same physical build as the men he saw fleeing the scene of the attack on Hill about one half hour earlier, but he noted that the shorter and stockier man (Ware) was no longer wearing a white shirt.

It was learned from the booking procedure that Evans and Ware were brothers and that they lived at 414 Columbus Avenue, just three blocks from where Hill had been attacked. Two detectives went to that residence in search of evidence that Ware had changed clothes after the Hill stabbing. In particular, they were looking for a white, short-sleeved shirt. They arrived at about 10 P.M. that same night and were greeted by Garry Edouard, the defendants' younger brother, who told them that Ware had in fact come home that evening and changed his shirt. He led them to an upstairs bedroom where he and the two defendants slept, and produced a white T-shirt with blue sleeves. He told the detectives, "This is what you're looking for." The detectives told him to put down the shirt. They summoned a uniformed officer to guard the room while they applied for a search warrant.

The detectives returned to 414 Columbus Avenue at 1 A.M. on May 7, 1993, with a search warrant, and seized the shirt Edouard had produced. While they were there, they spoke with the

mother of the defendants, who gave them a dark blue T-shirt that Evans had worn that evening. The shirt was torn and a piece was missing. A criminalist positively matched the dark blue piece of cloth found near Hill's wallet to Evans's torn shirt. Blood on the blade of the knife Evans had thrown to the ground was consistent with Hill's DNA. Hill died from sepsis, or bacterial infection, as a consequence of his stab wounds.

2. *Motion for required findings of not guilty.* Ware argues that the evidence of his involvement in the crimes against Hill was speculative and insufficient to survive his motion for required findings of not guilty. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). He concedes, for purposes of discussion, that the evidence linking Evans to both incidents was powerful, and that the evidence linking Ware to the attack on Wattles was sufficient.

Although no one positively identified Ware as one of Hill's assailants, the jury reasonably could have inferred that he was. The attack on Hill occurred within minutes of the attack on Wattles and shortly before the defendants' arrest. All three events occurred close in time and place. Wattles identified the defendants as his assailants at the time of their arrest, and he had described them in comparative terms that were similar to the comparative description given by eyewitnesses to the attack on Hill: the assailants were two African-American males, one taller and thinner than the other. These descriptions were consistent with the appearance of the defendants.[4] The attacks were executed in similar fashion: a knife and a beating were involved in each case, and the motive in each case was robbery. The defendants returned to the room they shared to change shirts after stabbing Hill. A piece of Evans's shirt was found at the scene where Hill was stabbed; and Ware's shirt, a whitish T-shirt with medium blue three-quarter length sleeves, was similar to the shirt one eyewitness described as the one worn by one of Hill's assailants. The inference that Ware participated in a joint venture with Evans to rob Hill at knifepoint was compelling.

[4]On May 6, 1993, Ware weighed approximately 220 to 230 pounds, and was between five feet ten inches and five feet eleven inches tall. Evans weighed approximately 170 pounds and stood about six feet one inch to six feet two inches tall.

Ware contends that the jury could only speculate that he, and not some third person, was involved in the attack on Hill. We disagree. There was no evidence that a third person substituted for Ware in the attack on Hill. A jury could properly infer that Evans and Ware had been together from the time Wattles passed them in Sparrow Park until they were arrested. There is no requirement, as Ware suggests, that that inference be necessary or inescapable. It need only be reasonable and possible. See *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977).

There is no merit to Ware's contention that the jury could not properly consider evidence of the attack on Wattles when deciding the issue of his involvement in the attack on Hill. His involvement in the attack on Wattles just minutes earlier was relevant to the question of the identity of Evans's coventurer in the two armed robberies. The unique circumstances, especially the temporal and spacial proximity, the similarities in execution, and the similarities in descriptions of the assailants, established a logical nexus between Ware and Evans and both sets of crimes for the purpose of proving Ware's identity as Evans's coventurer in the attack on Hill. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 433 (2002); *Commonwealth* v. *Marrero*, 427 Mass. 65, 72 (1998); *Commonwealth* v. *Jackson*, 417 Mass. 830, 836, 841 (1994); *Commonwealth* v. *Cordle*, 404 Mass. 733, 740 (1989), *S.C.*, 412 Mass. 172 (1992). The evidence was sufficient to permit the jury to find Ware guilty of the crimes against Hill. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 453 (1993).

3. *Excusing college students from jury.* The defendants argue that, as a matter of his personal policy, the judge impermissibly "excluded" from service on the jury all college students who indicated that the length of the trial would cause them to miss classes. The defendants point to a statement the judge made after an objection by counsel for Evans, in which he said: "My basic attitude is if a person is an undergraduate in school and they wish to be excused because they are going to be missing classes, I excuse them." We do not view this as a "policy" of "excluding" all college students from jury service.

The judge "excused" ten college students, including one graduate student, who indicated that, in response to a question put to the entire venire, a trial estimated to last two weeks

would create a hardship. Four students were more specific as to the hardship: one said she would miss twenty per cent of her classes; another said it would unduly affect his education; a third said that two weeks would cause her to exceed her allowable absences; and the fourth said she would miss three examinations. The judge could have relied on his own experience in concluding that a two-week trial could create a hardship for the ten students. The defendants do not contend that any of the college students excused would not have suffered a hardship if required to serve.[5] The judge did not excuse the students from service altogether, but directed each to return to the jury pool for service in other, presumably shorter, trials. We are satisfied that the judge's decision to excuse each of the ten college students on the basis of hardship was based on individual circumstances and not on the basis of any policy, and that the decision in each instance was within the judge's discretion under G. L. c. 234A, § 40 (trial lasting more than three days may be ground to excuse juror for hardship). The students were not "excluded" from service on the basis of occupation, a violation of G. L. c. 234A, § 3. The judge did not ask all college students to come forward so he could exclude them. They were excused on the basis of a hardship they asked him to consider.

The defendants further argue that college students constitute a " 'distinctive' group" who were systematically excluded from the venire, in violation of the fair cross section requirement of the Sixth Amendment to the United States Constitution. *Taylor* v. *Louisiana*, 419 U.S. 522, 537-538 (1975). *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96-97 (1980). Their claim fails for two reasons. A "distinctive group" is "one whose membership is reasonably set apart from others by clear lines of demarcation." *Barber* v. *Ponte*, 772 F.2d 982, 998 (1st Cir. 1985) (en banc), cert. denied, 475 U.S. 1050 (1986). Attendance at college does not establish such a line. Courts have consistently rejected the premise that a group defined by age or occupation constitutes a " 'distinctive' group" for Sixth Amendment purposes. See, e.g., *Commonwealth* v. *Bastarache, supra* at 98 n.10 (age); *Barber* v. *Ponte, supra* (age); *Anaya* v. *Hansen*, 781

[5]The trial actually lasted seventeen days, from September 24, 1998, to October 23, 1998.

F.2d 1, 5-6 (1st Cir. 1986) ("blue collar" workers). In addition to their failure to show that college students are a " 'distinctive' group," the defendants have failed to show that college students became significantly underrepresented in the venire as a result of the loss of the ten college students to hardship. See *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979); *Commonwealth* v. *Prater*, 431 Mass. 86, 90-93 (2000). There was no error.

4. *Exclusion of defendant from jury view.* Ware argues that his rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated when the judge denied his request to attend the jury's view of various streets in the South End that would be discussed in testimony. Neither Constitution affords such a right. See *Snyder* v. *Massachusetts*, 291 U.S. 97, 107-108 (1934) ("the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only"); *Commonwealth* v. *Gordon*, 422 Mass. 816, 849 (1996), and cases cited. Ware cites no authority to the contrary.[6] Absent some State constitutional or statutory provision or court rule granting a defendant the right to attend a nontestimonial jury view, there is no such specific right. As the United States Court of Appeals for the Seventh Circuit recently observed, "The lesson of *Snyder* is that, if in any given case the exclusion of the defendant from a jury view is found to be a deprivation of due process, it is not because the Constitution guarantees the defendant an absolute right to be present; it is only because his absence, *under the particular circumstances of his case,* can be said to have denied him a fair proceeding" (emphasis added). *Devin* v.

---

[6]The cases from other State courts on which Ware relies all involve a State constitutional provision, statute, or court rule that affords a defendant the right to be present during a jury view. See *People* v. *Roberts*, 2 Cal. 4th 271, 291, cert. denied, 506 U.S. 964 (1992) (statute); *Roberts* v. *State*, 510 So. 2d 885, 889 (Fla. 1987), cert. denied, 485 U.S. 943 (1988) (statute and court rule); *Palmer* v. *State*, 155 Ga. App. 368 (1980) (State Constitution); *Lee* v. *Commonwealth*, 262 Ky. 15 (1935) (statute); *People* v. *Mallory*, 421 Mich. 229 (1984) (statute); *People* v. *Smith*, 195 A.D.2d 265 (N.Y. 1993) (statute); *Colletti* v. *State*, 12 Ohio App. 104 (1919) (statute); *Jones* v. *Commonwealth*, 227 Va. 425, 428 (1984) (statute).

*DeTella*, 101 F.3d 1206, 1208 (7th Cir. 1996), cert. denied sub nom. *Devin* v. *Barnett*, 520 U.S. 1160 (1997).

In this Commonwealth, the decision to permit a defendant to attend a view is a matter that lies within the sound discretion of the trial judge. See *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 674 (1974). Judges may consider issues of security in deciding whether to permit a defendant to be present at a view. If a defendant is permitted to attend, a judge may impose reasonable conditions or restrictions. See *Commonwealth* v. *Mack*, 423 Mass. 288, 291 (1996).

The judge in this case did not state his reasons for denying Ware's request. For his part, Ware offered no reasons for the judge to consider. No testimony was received during the view. The purpose of the view was to assist the jurors in understanding the testimony that would be given at trial. Ware had lived in the area and was familiar with the layout of the streets seen on the view. Defense counsel attended the view, and there has been no showing that the defendant's absence contributed to a palpable and serious lapse in the defense or otherwise deprived him of a fair trial. See *Snyder* v. *Massachusetts*, *supra* at 109. The defense was identity, not that the crimes did not occur, or that they did not occur where the witnesses testified they had occurred. Ware has failed to meet his burden of showing that his exclusion from the jury view denied him a fair trial.

5. *The mask.* The defendants contend that a mask taken from Ware at the time of his arrest had no connection to any of the crimes committed against Wattles or Hill, and that it was impermissibly introduced as evidence of Ware's propensity toward crime. See *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 472 (1985).

The absence of any evidence that the crimes were committed with the use of a mask is not determinative. Evidence of a defendant's possession of the means to commit a crime within a reasonable time of the crime charged is admissible without proof that that particular means was in fact the one used. See *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). In the *O'Toole* case a handgun found in the defendant's room was admitted in evidence because the handle was capable of causing the blunt trauma suffered by the victim. There was no direct

evidence that the injuries were caused by that handgun, but it was relevant to show that the defendant had the means to commit the crime.

Here, the mask was relevant to show that Ware had the intent and means to rob. The mask is a thermal type mask that covers the nose and lower half of the face, with velcro straps that hold it in place at the base of the skull. A flap covers the bridge of the nose but not the nostrils, and holes in the area covering the mouth permit ease in breathing and talking. As the temperature at about 9 P.M. on May 6, 1993, was seventy degrees, the jury could reasonably infer that there was no apparent reason for Ware to have that type of mask, except to assist him in committing robberies, if necessary. There was no error.

Evans argues that the mask created unfair prejudice that spilled over to his case. A claim of spillover prejudice from the evidence offered against a codefendant requires a showing of substantial prejudice. Cf. *Commonwealth* v. *Pontes*, 402 Mass. 311, 314-315 (1988) (evidence that codefendant fled from police did not substantially prejudice defendant). Evans has failed to make that showing. Any prejudice from the mask paled in comparison to the strength of the Commonwealth's case against Evans.

6. *Hearsay testimony from expert witness.* A criminalist from the Boston police laboratory gave expert testimony about tests and examinations she performed on various items of physical evidence, including the matching pieces of Evans's shirt. She also testified to the results of tests conducted by a criminalist who had retired and did not testify. One such test yielded positive results for the presence of human blood on Evans's knife. The sample was insufficient, however, to determine blood group. Because her testimony in respect to the tests done on the knife went to the fact of the test results obtained by someone else, it was hearsay. She did not express an opinion based on her review of test data that was not admitted in evidence but was otherwise independently admissible. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986). Her testimony about the results of testing done on the knife did not come under any exception to the hearsay rule, and as such, it was inadmissible. See *Commonwealth* v. *Jaime*, 433 Mass. 575, 577 (2001); *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 273 (1990).

Because the defendants did not object to the testimony concerning the testing done on the knife, we review to determine whether the error caused a substantial likelihood of a miscarriage of justice. The evidence that a small amount of human blood was on the knife, alone, was not especially damaging, particularly where the test did not identify either the source or the blood group. It was overshadowed by the testimony of two experts in DNA testing and analysis. The analyst testified that DNA from the blood on the blade of the knife matched Allan Hill's DNA, and that such a match would be found in only one in 150,000 Caucasians, one in 200,000 Hispanics, and one in 300,000 African-Americans. The evidence from the criminalist did not create a substantial likelihood of a miscarriage of justice.

7. *Evidence that defense experts witnessed DNA testing by Commonwealth experts.* Over objection, the prosecutor elicited testimony from the Commonwealth's DNA experts that experts retained by the defendants were present during DNA testing, and that an expert observer could have detected any errors in the testing procedures. The defendants contend that this evidence impermissibly shifted the burden to them to produce experts in their defense. See *Commonwealth* v. *Conkey*, 430 Mass. 139, 147 (1999). We disagree.

The evidence that defense experts were present during DNA testing was first elicited on redirect examination after the reliability of the DNA tests had been challenged during cross-examination. The prosecutor elicited the evidence for its tendency to show that the DNA tests were more likely to be performed fairly if subjected to scrutiny by defense experts. The prosecutor did not suggest to the jury that the defendants had a duty to call those experts, or that by failing to call them they were somehow admitting guilt. The evidence did not constitute a comment on the defendants' right to remain silent. The evidence was properly offered to bolster the credibility of the Commonwealth's DNA experts. Properly admitted evidence that increases the risk of conviction and thereby "compels" a defendant to present a defense does not violate the privilege against self-incrimination. See *Williams* v. *Florida*, 399 U.S. 78, 83-84 (1970); *Commonwealth* v. *Beauchamp*, 49 Mass. App. Ct. 591, 606-607 (2000). Moreover, there was no harm. The

defendants *did* call an expert witness on DNA, just not one of the experts who had witnessed the testing. There was no error.

8. *Exclusion of negative identification evidence.* The defendants offered testimony from a police officer that an eyewitness to the attack on Hill stated, when confronted at the scene with the defendants shortly after their arrest, that they were not the perpetrators. The evidence was offered both under the spontaneous utterance exception to the hearsay rule, and under the rule in *Chambers* v. *Mississippi,* 410 U.S. 284, 302 (1973) ("hearsay rule may not be applied mechanistically to defeat the ends of justice"). The judge rejected both arguments and excluded the evidence.

(a) *Spontaneous utterance.* A statement is admissible under the spontaneous utterance exception to the hearsay rule if "(1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' " *Commonwealth* v. *Santiago,* 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). The rationale behind this exception to the hearsay rule is that such statements "may be taken as particularly trustworthy." *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 222 (1973), quoting J. Wigmore, Evidence § 1747 (3d ed. 1940).

The judge found that the witness's negative identification was the product of deliberation, based on the witness's reluctance to get involved. During a voir dire, there was testimony that, when police told the witness they were bringing the defendants over for him to look at, he refused and said he did not want them to see him. He continued to refuse, even after being placed in an unmarked police car. He expressed fear of repercussions. When the defendants walked by, he gave them a cursory look and said that they were not the assailants. A judge has broad discretion to admit a statement as a spontaneous utterance, and his decision will not be disturbed absent clear error. See *Commonwealth* v. *McLaughlin, supra* at 223. There was ample record support for the judge's decision to exclude the statement as reflective, and not reflexive. We cannot say that he was plainly wrong. There was no error.

(b) *Rule in* Chambers *v.* Mississippi. In *Chambers* v. *Mississippi, supra,* the Supreme Court reversed the conviction of a man whose defense was that the crime was committed by another, one McDonald. Chambers called McDonald to testify, and introduced McDonald's sworn confession. On cross-examination, the State elicited from McDonald that he had repudiated his confession. McDonald further testified on cross-examination that he did not commit the crime, and had confessed "only on the promise of [a clergyman] that he would not go to jail and would share in a sizable tort recovery." *Id.* at 291.

Chambers was prohibited from impeaching McDonald on redirect examination with admissions he had made to three friends, separately, that he had committed the crime. At the time, Mississippi law prohibited a party from impeaching his own witness. Chambers also was precluded from calling as witnesses the three men to whom McDonald made his admissions, because, although Mississippi recognized declarations against interest as an exception to the hearsay rule, it only did so with respect to pecuniary interest, and not penal interest. *Id.* at 291-294, 295, 298-299. The Court concluded that, in the circumstances, Chambers had been denied a fair trial. *Id.* at 303.

The Court reasoned that, because McDonald's statements to his three friends were highly trustworthy, i.e., each statement was made spontaneously to a friend and was corroborated by some other evidence in the case, it came within the general rationale underlying exceptions to the hearsay rule (and here, the exception for declarations against interest), namely, reliability. See *Commonwealth* v. *Carr,* 373 Mass. 617, 623 (1977). And because the evidence was critical to the defense, it should have been admitted either to cross-examine McDonald, who was available and under oath, or through the testimony of McDonald's friends. The Supreme Court said that, "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers* v. *Mississippi, supra* at 302.

Here, as in the *Chambers* case, there is no dispute about the importance to the defense of the negative identification

evidence. However, unlike the *Chambers* case, the defendants cannot show that this hearsay evidence was reliable or trustworthy. The judge expressly found that the evidence was not reliable.

The judge did not apply the hearsay rule mechanistically to exclude otherwise trustworthy and reliable evidence that the exceptions to the hearsay rule were designed to accommodate. The judge applied the hearsay rule and the spontaneous utterance exception in precisely the way they were designed to function: to sort out reliable from unreliable hearsay. Here, the analysis came down against the defendants.

The *Chambers* case "establish[ed] no new principles of constitutional law. Nor [did it] signal any diminution in the respect traditionally accorded to States in the establishment and implementation of their own criminal trial rules and procedures." *Id.* at 302-303. It did not create a constitutional right to the admission of unreliable hearsay. *Commonwealth* v. *McAfee*, 430 Mass. 483, 489-492 & n.3 (1999) (defendant claiming self-defense had no right to introduce hearsay evidence that victim was armed); *Commonwealth* v. *Piper*, 426 Mass. 8, 10-11 (1997) (defendant had no right to introduce codefendant's hearsay claim that codefendant alone committed crime); *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 62-63 (1989) (defendant had no right to introduce hearsay evidence that victim failed to select his photograph from array); *Commonwealth* v. *Drew*, 397 Mass. 65, 75 (1986) (defendant had no right to introduce codefendant's hearsay claim that defendant was not present at crime scene). The evidence was properly excluded.

There is no merit to the defendants' claim that they should not suffer because of the unavailability of the negative identification witness where police failed to obtain his birth date and social security number. The police had no duty to do so. Cf. *Commonwealth* v. *Curcio*, 26 Mass. App. Ct. 738, 747 (1989) (Commonwealth had no duty to locate witness not under its control). There was no error.

9. *Exclusion of evidence of past recollection recorded.* The judge properly declined to admit, under the "past recollection recorded" exception to the hearsay rule, a memorandum prepared by an assistant district attorney concerning a conversa-

tion he had with a police detective. The defendant failed to show (1) that the assistant district attorney who prepared the memorandum had no revivable recollection of the subject of the memorandum, and (2) that the memorandum was created when the events were still fresh in his memory. The witness's recollection was refreshed by the memorandum by the time of trial, and the memorandum was not created until four to six weeks after the conversation with the detective. Thus, two of the four foundational requirements of that exception were not satisfied. See *Commonwealth* v. *Nolan*, 427 Mass. 541, 543 (1998).

There is a further basis for excluding the memorandum. The defendants had intended to use a statement in the memorandum as the prior inconsistent statement of a detective, to impeach that detective. However, the statement, as written, was not attributable to the detective with sufficient precision to be used for the intended purpose. See *Commonwealth* v. *Beauregard*, 25 Mass. App. Ct. 983, 984 (1988). The assistant district attorney testified during a voir dire that the statement was based on a series of his assumptions, and was not a summary of what the detective told him. There was no error.

10. *Consciousness of innocence.* Evans offered, as "consciousness of innocence," evidence that he continued to live at home while released on bail. The judge excluded the evidence. "Such evidence is of little value because there are many reasons why a guilty person might refrain from flight," and the jury were unlikely to give it much weight. *Commonwealth* v. *Oeun Lam*, 420 Mass. 615, 620 (1995). The defendants have failed to meet their burden of showing that the judge committed palpable error by excluding the evidence. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 349 (1998).

11. *Failure to give "separate consideration" instruction.* Ware argues that it was error to fail to instruct the jury to give separate consideration to the evidence against each defendant. Because Ware never requested such an instruction and never objected to the failure to give such an instruction, we review to determine whether any error resulted in a substantial likelihood of a miscarriage of justice.

Ware cites no authority that supports his argument. His reliance on *United States* v. *Rosario-Diaz*, 202 F.3d 54 (1st Cir.

2000), is misplaced. In that case the court said that a judge "must take care that the evidence against one defendant is not . . . used as a basis for convicting another defendant not connected to that evidence." *Id.* at 68, quoting *United States* v. *Drougas*, 748 F.2d 8, 18-19 (1st Cir. 1984). The court was not reviewing the failure to give a separate consideration instruction, but was only considering whether certain defendants had been unfairly prejudiced by the "spillover" effect of evidence offered against some codefendants. Here, there was no evidence admitted against Evans alone that spilled over to Ware and unfairly prejudiced Ware. See Part 5, *supra*, concerning the question of spillover onto Evans from the mask found on Ware.

We need not decide whether it is error to fail to give a separate consideration instruction because the instructions as a whole adequately addressed the matter.[7] In his instruction on the application of principles of joint venture to felony-murder, the judge instructed that:

> "The Commonwealth must prove beyond a reasonable doubt that the defendant knew that his accomplice had a weapon . . . that the defendant intentionally assisted the perpetrator in the commission of the crime and that he did this possessing the mental state required for the crime. . . . I am going to repeat that to you, folks. I instruct you that if the Commonwealth has not proven beyond a reasonable doubt that *each defendant* knew his accomplice had a weapon . . . then you must find the defendant not guilty . . . ." (emphasis added).

Earlier, in his instruction on armed robbery and armed assault with intent to rob, the judge instructed the jury, "*Each* count must be considered separately and *each* count must be proven beyond a reasonable doubt and *each* count must have a unanimous jury verdict" (emphases added). The instructions in their entirety adequately conveyed to the jury that the Commonwealth's burden was to prove guilt individually. There was no error.

12. *Review under G. L. c. 278, § 33E.* We have reviewed the

---

[7]For an example of a "separate consideration" instruction, see *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 484-485, cert. denied sub nom. *Pirrotta* v. *Massachusetts*, 479 U.S. 838 (1986).

entire record, the transcripts, and the briefs. We see no basis to grant a new trial or reduce the degree of guilt on the murder verdicts. We note that because the defendants were convicted of murder in the first degree on theories of both felony-murder and extreme atrocity or cruelty, the consecutive sentences imposed on the indictments alleging armed robbery, the underlying felony on the felony-murder convictions, were not duplicative. See *Commonwealth* v. *Hogan*, 426 Mass. 424, 435 (1998).

*Judgments affirmed.*