## Commonwealth *vs.* Paul Jones.

Middlesex. February 7, 2003. - April 29, 2003.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Sosman, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Admissions and confessions, Motion to suppress, Waiver, Voluntariness of statement, Argument by prosecutor, New trial. *Evidence,* Admissions and confessions, Hearsay, Joint enterprise, Exculpatory. *Homicide. Joint Enterprise.*

In a murder case, the evidence presented at a hearing on the defendant's motion to suppress his statements to police warranted the judge's conclusions that the defendant voluntarily waived his Miranda rights, gave a voluntary confession, and did not invoke his right to an attorney before his confession. [254-259]

At a murder trial, the judge did not err in allowing references in the prosecutor's opening statement to hearsay, where there was no evidence the prosecutor acted in bad faith, where the judge adequately instructed that the attorney's statements were not evidence, and where the substance of all the statements objected to on appeal was introduced at trial [259-261]; in allowing unobjected to hearsay statements, not within any exception, to be admitted at trial, where the defendant's contention was meritless in that the statements furthered the defendant's trial strategy [261-262]; in allowing a witness to testify that the defendant's girl friend had said that the victim was "dead and finally out of her life," where the statement supported the defendant's theory that the girl friend "hatched the plot to kill" the victim, and was not prejudicial [262]; and in allowing additional testimony without the speaker being identified, where such testimony was properly admitted under the joint venture exception to the hearsay rule, and was not prejudicial [262-263].

At a murder trial, the judge's failure to instruct the jury concerning the joint venture exception to the hearsay rule did not create a substantial likelihood of a miscarriage of justice, where the defendant benefited from the judge's decision because, had a joint venture instruction been given, it would have been difficult for the defendant to separate himself from the bad light that had been cast on another involved in the crime. [263-264]

There was no merit to the argument of a defendant in a murder case that he was prejudiced by the cumulative effect of a number of alleged errors by the judge, especially considering that the defendant benefited from all the alleged errors. [264]

A Superior Court judge did not err in denying a motion for a new trial of the defendant in a murder case on the basis of the defendant's claim that he was deprived of exculpatory evidence (a letter) where, based on affidavits

submitted by the Commonwealth, it was reasonable for the judge to conclude that the letter did not exist, or that if it did, the alleged evidence was so vague and cryptic that it was not exculpatory. [264-265]

INDICTMENT found and returned in the Superior Court Department on February 22, 1996.

A pretrial motion to suppress evidence was heard by *Robert A. Barton*, J., and the case was tried before him; a motion for a new trial was heard by *Elizabeth M. Fahey*, J.

*Nancy A. Dolberg* for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. A jury convicted the defendant, Paul Jones, of murder in the first degree by reason of deliberate premeditation. The defendant filed a timely notice of appeal. His motion for a new trial, filed in this court and remanded to the Superior Court, was denied. His appeal from that ruling has been consolidated with his direct appeal. The defendant challenges the denial of his motion to suppress his statements to the police; the admission of certain hearsay statements[1]; the failure to instruct the jury on joint venture; the cumulative effect of the alleged errors; and the denial of his motion for a new trial. The defendant also requests that the court use its extraordinary power under G. L. c. 278, § 33E, to reduce the verdict. After considering these arguments and reviewing the entire record pursuant to § 33E, we find no reason to grant a new trial or to reduce the degree of guilt. Accordingly, we affirm the conviction and denial of a motion for new trial.

I. *Facts.*

We recite the facts in the light most favorable to the Commonwealth, reserving certain portions for discussion in connection with the issues raised. In order adequately to summarize the Commonwealth's evidence of premeditation, we must go into great detail with respect to certain aspects of the facts. On

---

[1]The defendant objects to some statements on the basis that they were hearsay not within any exception. There are other hearsay statements that were admitted under the joint venture exception that the defendant claims should have been excluded because it was unclear who made the statements.

February 7, 1996, the body of the sixteen year old victim was found in a wooded area in Ashby, protruding from a trash bag with a bicycle chain around her neck. The victim's body was frozen to the ground. The ankles and wrists were bound with duct tape, and the hands were bound to the body. The victim's neck had an abrasion stained with black grease, in a pattern consistent with the bicycle chain. There was no grease on the victim's hands. The medical examiner opined that the cause of death was strangulation by ligature, and that the bicycle chain could have been the murder weapon.

The victim's rectum contained sperm cells mixed with her blood, consistent with the victim's having anal intercourse before her death. The sperm cells were consistent with the defendant's DNA, but due to the mixture with the blood, the laboratory was unable to calculate the statistical probability of the DNA match. The police discovered fourteen fingerprints from the inside layers of the duct tape, thirteen of which matched the defendant's. The police were unable to identify the remaining print.

The victim's older sister, Heather Santerre, had been dating the defendant for about five years. Santerre, who was approximately eighteen years old at the time of the murder, lived with the defendant (who was approximately nineteen years old at the time of the murder), his mother, and his three younger siblings, in the family's three-bedroom home in Groton. Although Santerre and the victim did not live together for most of their lives, they had maintained a close relationship. In the summer of 1995, the victim moved into the defendant's family's home with Santerre. Afterward her relationship with Santerre deteriorated, and the sisters argued frequently.

In late December, 1995, Greg Michaud also moved into the defendant's family's house, and shared the defendant's bedroom with the defendant and Santerre. Michaud's girl friend, Patricia McKinnon, was a long-time friend of Santerre and frequently spent the night, sleeping in the same bedroom as the defendant, Santerre, and Michaud.

The Commonwealth's primary witness at trial was McKinnon, who testified to the following. Santerre and McKinnon believed that the victim was sexually involved with their respec-

tive boy friends. In an effort to substantiate their suspicions, Santerre and McKinnon looked through the victim's personal belongings in search of her diary. Santerre read aloud a portion of the diary that indicated that the victim "was in love with [the defendant], that they were going to be together and [Santerre] would be out of the way, and they'd be happy." Santerre read similar sentiments in a letter written by the victim to the defendant.

On Friday, January 26, 1996, Santerre, the defendant, and McKinnon went for a drive. The conversation in the car turned to planning the victim's death[2] and looking for places to dispose of the body. They looked at several places, but did not find any "good spots." On the way back to McKinnon's house in Ashby, Santerre turned down a dirt road, and the defendant requested that Santerre stop the car. The defendant identified a place at the side of the road that he said was a "good spot" because there was a tree, the base of which was not visible from where he was standing. Santerre asked McKinnon to help with the murder by luring Michaud away from the house. McKinnon refused. McKinnon asked if the defendant and Santerre were serious about their plan to kill the victim and they responded that "they weren't; that it was [Santerre's] sister, and they couldn't do it."

On the morning of Sunday, January 28, 1996, the defendant called McKinnon and said, "Today is the day. We're going to do it." Later that day, Santerre and Michaud picked up McKinnon and on the way back to the defendant's house, Santerre stopped the car five times, and made a telephone call at each stop. After Santerre drove into the defendant's driveway she sounded the horn. Santerre got out of the car, and exchanged words with the defendant who was at a window on the second floor. The defendant "shook his head 'yes,' " and Santerre returned to the car. Santerre, McKinnon and Michaud drove to a

---

[2]Santerre said that she was going to hit her sister over the head with a frying pan. The defendant suggested that would not work, because it would probably just knock her out. The defendant said that he would strangle the victim with a rope or chain. Santerre said that they would kill the victim on Monday when the defendant's mother and younger siblings were out of the house. Santerre also suggested that the defendant lure the victim to his room by making her think that "they were going to have sex."

grocery store, returned to the house approximately ten minutes later, and Santerre honked the horn again. The defendant came to the window, "shook his head 'yes,' " and Santerre went into the house. Santerre returned to the car approximately five minutes later, and told McKinnon to take a drive with Michaud. McKinnon and Michaud came back approximately one hour later, and found the defendant, Santerre, and the defendant's mother unpacking groceries in the kitchen. McKinnon went upstairs to the defendant's bedroom to get a sweatshirt, and she noticed a piece of pipe on the floor. The defendant entered the bedroom and said, "She's dead."

The defendant told McKinnon that he had killed the victim. He said that he lured her into his room by saying that "they were going to have sex." The defendant said that he taped her arms to her legs, blindfolded and gagged her, and put a bicycle chain around the victim's neck. The defendant said that he pulled on the chain, and asked if the victim trusted him. The defendant said that he pulled the chain to get her to stop breathing. Every time that he loosened the chain the victim would gasp for a breath. The defendant's hands began to hurt, so he picked up the piece of pipe and used it to pull the chain. He pulled until she stopped breathing. The defendant and Santerre were going to carry the victim down to the garage, but the victim "had gotten a heartbeat back on the way down." The defendant said that he pulled the chain tightly around the victim's neck, and snapped it. The defendant and Santerre then put the victim in a garbage bag, and put her body into a garbage can in the garage. The defendant showed McKinnon red marks on his hand from the chain. McKinnon returned to the kitchen, and shortly thereafter, Santerre said that the victim was "finally dead and out of her life,"and she "started dancing around."

The defendant and Santerre concocted a story to explain the victim's disappearance. They said that the victim argued with them and ran out of the house. On several occasions the defendant and Santerre went "to look for" the victim. The defendant told McKinnon not to say anything to anybody, and that if she did, the defendant would "get [her], too." During the rest of the week McKinnon talked to the defendant a few times, and he reminded her not to say anything.

On February 5, 1996, McKinnon went with her mother to the Groton police station. McKinnon told police that she heard the defendant say "something about [the victim] and where she was." Two days later, McKinnon went to the police station again, and told police that the defendant had killed the victim. Based on the information provided by McKinnon, the police found the victim's body.

The Commonwealth also introduced evidence that Gerald Intonti was an inmate at the Cambridge jail where the defendant was being held for trial. Intonti testified that the defendant admitted to him that he murdered the victim. The defendant told Intonti that he brought the victim up to his bedroom, that he used the duct tape "under the premise of having sex games," that he put a chain around her neck, and used a piece of pipe to twist the chain.

At trial, the defense did not argue that the defendant did not kill the victim. Rather, defense counsel argued that the killing was not premeditated, and that the defendant acted in the heat of passion, under sudden provocation, and therefore was guilty of something less than murder in the first degree. The defendant's theory was that Santerre and McKinnon were the ones who plotted to kill the victim,[3] and that the defendant did not want to carry out their plan. The defense strategy was to discredit McKinnon and Intonti's credibility and to show that Santerre was dominant in her relationship with the defendant.

II. *Discussion.*

A. *Motion to suppress statements to police.* The defendant claims that the judge erred in refusing to suppress statements that he made to the police because his waiver of the Miranda warnings was invalid; the confession was not voluntary; and the police continued to interrogate the defendant after he invoked his right to counsel. The motion judge, who was also the trial judge, held an evidentiary hearing on the defendant's motion to suppress. In reviewing the denial of a motion to suppress, "we 'grant substantial deference to the judge's ultimate conclusions,' " *Commonwealth* v. *Rodriguez,* 425 Mass. 361, 364 (1997), quoting *Commonwealth* v. *Mandile,* 397 Mass. 410, 412

---

[3]There was evidence at trial that McKinnon found out that the victim was having a sexual relationship with Michaud.

(1986), and "accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. However, we "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). The judge's findings are adequately supported by the record, and we affirm his conclusions that the defendant voluntarily waived his Miranda rights, gave a voluntary confession, and did not invoke his right to an attorney.

We summarize the judge's findings of fact. After McKinnon went to the police on February 5, 1996, the police questioned the defendant about the victim's disappearance. The police gave the defendant the Miranda warnings, and the defendant agreed to speak with them. The defendant told the police that he had an argument with the victim, and that she left his house. On February 7, 1996, at approximately 11:30 A.M., the defendant agreed to go to the police station again to talk with the police.

Sergeant James Connolly of the State police advised the defendant of his Miranda rights by reading a form used by the Groton police. The defendant said that he understood his rights, and that he had been read his rights two days earlier by Inspector Irvin Pierce. The police told the defendant that Santerre and McKinnon gave statements implicating the defendant in the victim's death, but the defendant continued to deny any involvement. Sometime between 4:30 P.M. and 5 P.M., the defendant was alone with Inspector Mark Knowlton. The two men went outside for a "cigarette break," and then to a "bathroom break." Inspector Knowlton did not question the defendant during this time, but rather talked about old cars and bicycles. At some point after they returned to the interview room the defendant said, "I'm going to need a lawyer sometime." Inspector Knowlton responded that the defendant was entitled to a lawyer, and that there was an assistant district attorney down the hall who would get him a lawyer. The defendant stated that he had no money and could not afford one. Inspector Knowlton told the defendant that he did not need any money, and that the State would provide him with a lawyer

because it was his constitutional right.[4] The defendant looked directly at Inspector Knowlton and "shook his head in the negative."

Approximately twenty minutes later, Inspector Knowlton asked the defendant to review the events of January 28, 1996. At this time, the defendant gave a "free-flowing narrative" of the victim's murder. In essence, the defendant said that he had an argument with the victim about their relationship, and that the victim pushed, kicked, and punched him. The defendant further described the altercation, and said that at "some point he had the [bicycle] chain in his hand and [the victim] tried to grab it. He said that he then grabbed her by the throat and then raised her." The victim cried and tried to grab the chain. The defendant last remembered putting the chain to the victim's neck. The defendant said that he saw Santerre standing in the door, but did not know how long she was there. Santerre entered the bedroom, hit the victim and "took a piece of her thigh." Santerre brought a trash can up to the room, and the defendant and Santerre brought the victim's body to the garage. The defendant told police that he went to the garage later that night and said, "I'm sorry," to the victim's body.

1. "The Commonwealth bears the burden of proving the validity of a Miranda waiver beyond a reasonable doubt. *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 (1983). To be valid the waiver must be made voluntarily, knowingly, and intelligently." *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-670 (1995), citing *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The Commonwealth must also prove beyond a reasonable doubt that the statements were made voluntarily. *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000), and cases cited. "A statement is voluntary if it is 'the product of a rational intellect and

---

[4]The defendant's contention that the judge improperly paraphrased what Inspector Knowlton said is without merit. During the motion hearing, Inspector Knowlton testified that he told the defendant, "There's an assistant district attorney right down the hall. I can go and get him for you, and he will get you a lawyer." Inspector Knowlton also testified that the defendant explained that "he didn't have any money for a lawyer, and I said he didn't need any money. One is provided to him, I believe I said, under his constitutional rights." On cross-examination, Inspector Knowlton testified that he told the defendant, "There's a D.A. right down the hall. We can get you a lawyer if you want one and it will be provided for you under your constitutional rights."

a free will.' " *Id.,* quoting *Commonwealth* v. *Davis,* 403 Mass.
575, 581 (1988). Although the validity of a defendant's Miranda
waiver and the voluntariness of his statements are separate
inquiries, we use a totality of the circumstances test for both.
*Commonwealth* v. *Jackson, supra* at 85-86.

The defendant argues that given the totality of the circum-
stances, he did not voluntarily, knowingly, and intelligently
waive his right to remain silent and his right to counsel. In
particular, he points to the facts that he dropped out of school in
the ninth grade, had a history of attention deficit disorder with
hyperactivity, reported receiving mental health treatment, tested
in the borderline to low-average range for intelligence, had
impaired to well below-average academic skills, and had no
prior experience with the criminal justice system. The defendant
also claims that he was questioned at the police station for over
five hours, with up to five police officers at a time.

The judge found that the defendant voluntarily accompanied
officers to the police station, was given food, drink, and cigarette
breaks outside the police station, and was not continuously
questioned.[5] Sergeant Connolly read the defendant his rights,
and the defendant was also given an opportunity to read his
rights. The defendant spoke coherently and appropriately with
the officers. The defendant was sober, coherent, and responsive
during his interactions with the police. The police officers did
not attempt to intimidate or deceive the defendant. The
defendant did not request a pause in interrogation and did not
exercise his right to remain silent or to have an attorney. The
defendant was interviewed approximately two months later by
Dr. Paul Nestor, then the forensic mental health supervisor at
Bridgewater State Hospital, to determine the defendant's
competency to stand trial. During Dr. Nestor's interview, the
defendant was attentive, alert, and oriented. The defendant was
also able to communicate without difficulty in recalling or
retrieving information, and was able to understand the charge
against him and its consequences.

Based on these findings, the judge concluded that the

[5]The record contains adequate support for the judge's findings that the
defendant was not continuously questioned. The record also shows that at no
time was the defendant questioned by five officers at once.

defendant voluntarily waived his Miranda rights, and in a separate analysis, concluded that the defendant's statements were voluntary. We agree.

2. The defendant argues that even if his waiver of rights was valid, he invoked his right to an attorney before his confession. Once the defendant invokes his right to an attorney, the police must stop questioning until an attorney is present. *Commonwealth* v. *Judge*, 420 Mass. 433, 448 (1995), citing *Miranda* v. *Arizona*, *supra* at 474. However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Commonwealth* v. *Judge*, *supra* at 450, quoting *Davis* v. *United States*, 512 U.S. 452, 459 (1994).

The defendant posits that his statement that he was "going to need a lawyer sometime" was an invocation of the right to counsel. He further claims that the police officer's response to his invocation was very confusing, and led the defendant to believe that "the prosecutor was going to be brought down to meet with the defendant, and that the assistant district attorney would choose a lawyer for him." The defendant asserts that in denying his motion to suppress, the judge did not consider the defendant's understanding of Inspector Knowlton's response, given the defendant's low intelligence and limited education, inexperience with the criminal justice system, the length of questioning, and the number of police officers who had interrogated him.[6]

The judge concluded that the defendant's statement that he was "going to need a lawyer sometime," together with his refusal to pursue Inspector Knowlton's statement that he was entitled to a lawyer, and that the State would pay for one, did not constitute an affirmative request for an attorney. We agree. "We have repeatedly held that equivocal statements and musing

---

[6]The first time that the defendant argued that he was confused by the officer's response was on appeal. He did not pursue this argument in his memorandum in support of his motion to suppress, at the hearing for the motion to suppress, or at trial. Nor has the defendant asserted this directly by way of testimony or an affidavit.

concerning the need for an attorney do not constitute . . . an affirmative request" for an attorney. *Commonwealth* v. *Obershaw*, 435 Mass. 794, 800 (2002), and cases cited. Cf. *Commonwealth* v. *Contos*, 435 Mass. 19, 29 (2001) ("I think I'm going to get a lawyer" was unambiguous invocation of right to counsel because in "normal parlance" it is "an acceptable and reasonable way to frame a request"). Moreover, the officer's response was not, as the defendant contends, "less than adequate." Cf. *Commonwealth* v. *Magee*, 423 Mass. 381, 387 (1996) ("less than adequate" response when police "point to the telephone and tell the defendant she could call anyone she wanted" after defendant said that "she did not know any attorneys and wondered how she could get an attorney . . . at that hour on the Fourth of July"). Inspector Knowlton's response was not erroneous and there is no evidence that he intended to trick the defendant. See *Commonwealth* v. *Grainier*, 415 Mass. 680, 683-684 (1993).

Furthermore, the confession benefited the defendant at trial. The Commonwealth presented two witnesses (McKinnon and Intonti) who testified that on separate occasions the defendant admitted that he murdered the victim. Both accounts supported the Commonwealth's theory that the killing was premeditated, and that the defendant lured the victim to his room, substantially in accordance with the plan discussed in the car on January 26, 1996. In addition, there was evidence that the victim's hands were duct taped to her body, that thirteen of the fourteen fingerprints on the inside layers of the duct tape came from the defendant, and that there was no grease on the victim's hands. The defendant did not testify. The only evidence that there was an altercation between the defendant and the victim, was the defendant's statement to the police. Thus, absent the defendant's confession to the police, the defense attorney had no basis for arguing that the defendant did not act pursuant to the plan, and that the defendant "had an argument, and during the course of the heat of that argument is when [the victim] was killed."[7]

B. *Statements at trial.* The defendant contends that most of

---

[7]In fact, defense counsel acknowledged at a bench conference that he wanted the jury to believe the defendant's statement to the police because if believed, the statement supported a lesser degree of guilt.

the evidence of premeditation was introduced by McKinnon or Santerre's mother, and consisted of statements allegedly made by Santerre, who did not testify at the trial. The defendant posits that while some of the statements qualified as those of a coconspirator,[8] others were inadmissible hearsay. In particular, the defendant argues that the judge erred in allowing references in the prosecutor's opening statement to hearsay; certain unobjected-to hearsay statements; and a hearsay statement allowed over the defendant's objection. In addition, the defendant contends that a portion of McKinnon's testimony, which the judge allowed under the joint venture exception to the hearsay rule, was inadmissible because McKinnon did not identify who was speaking. We address the defendant's allegations in turn.

1. The defendant argues that the prosecutor's opening statement contained statements allegedly made by Santerre, some of which were later excluded on direct examination because they were hearsay.[9] Thus he claims that the statements should not have been referenced in the opening statement. The defendant did not object to the prosecutor's opening statement.

"A prosecutor in his opening may explain the facts that he expects to prove during the trial, so long as he has a good faith expectation that he will be able to do so with relevant and admissible evidence." *Commonwealth* v. *Thomas*, 429 Mass. 146, 157 (1999), and cases cited. "[A] claim of improper [opening statement] by the prosecutor must be judged in light of the entire [statement], the judge's instructions to the jury, and the

---

[8]The defendant does not appear to argue that the judge erred by admitting statements that qualified under the joint venture exception to the hearsay rule. We note that near the beginning of the trial, the judge admitted statements under the joint venturer exception, but ruled that he would entertain a motion to strike those statements if the defendant so moved at a later time. The defendant never moved to strike the statements.

[9]The defendant claims that the following statements in the prosecutor's opening were improper: in the fall of 1995, Santerre told friends that she was worried that the victim was falling in love with the defendant; the victim, Santerre, and their mother argued about the defendant; Santerre read an entry from the victim's diary and a letter written by the victim to the defendant both of which indicated that the victim was in love with the defendant; on January 26, 1996, Santerre told McKinnon that she knew that the victim was "sleeping with" the defendant, and that Santerre was going to kill her sister; and after the victim was murdered, Santerre told McKinnon, "Did you hear? She's gone. I finally can be happy in my life . . . ?"

evidence actually introduced at trial." *Id.* at 158. Applying these principles, it is clear that the prosecutor's opening statement was proper.

There is no evidence that the prosecutor acted in bad faith, nor does the defendant make this claim. Additionally, the judge instructed the jury, both before and after opening statements, that the attorneys' statements were not evidence. Moreover, the substance of all the statements that the defendant now objects to was introduced at trial. The statements concerned the defendant's sexual involvement with the victim, Santerre's knowledge about that relationship, and Santerre's displeasure that the defendant and victim were sexually involved. Indeed, rather than harming the defendant, these statements all support his theory that Santerre and McKinnon developed the plan to murder the victim, as they demonstrate Santerre's jealousy and anger about the victim's involvement with the defendant. The statements also buttress the defendant's contention at trial that he had no motive to murder the victim because he was sexually involved with her. We find additional basis for our conclusion in the defense counsel's opening statement, which referred to some of the same hearsay statements in the prosecutor's opening.

2. Next we address the defendant's contentions that the judge allowed unobjected-to hearsay, not within any exception, to be admitted at trial.[10] The defendant contends that none of the statements qualified under the joint venture exception to the hearsay rule because they were not made during or in furtherance of a conspiracy. We will assume without deciding that the statements did not properly fit within any exception to hearsay.

"Hearsay, once admitted, may be weighed with the other evidence, and given any evidentiary value which it may possess." *Commonwealth* v. *Carmona*, 428 Mass. 268, 271 (1998), quoting *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 (1987). Because the defendant did not object to the admission of the testimony at trial, we review the admission of the state-

---

[10]The defendant complains that the following statements were improperly admitted: Santerre read aloud the victim's diary and a letter written to the defendant from the victim; Santerre and the victim argued about the defendant, and the defendant would break up the arguments; and Santerre said that she wanted the victim "out of there."

ments to determine whether the jury's consideration of the statements created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Carmona, supra,* citing *Commonwealth* v. *Raymond,* 424 Mass. 382, 388 (1997).

The defendant's contention that the admission of these statements was prejudicial is without merit. The statements, like those contained in the prosecutor's opening, concerned Santerre's knowledge of the defendant's relationship with the victim, and Santerre's anger toward the victim. The defendant used the statements to advance his theory that Santerre and McKinnon were the people with motive to kill the victim, and were the ones who "hatched the plot to kill" the victim. Because the statements furthered the defendant's strategy, "we are substantially confident that, if the [alleged] error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock,* 428 Mass. 288, 292 n.3 (1998).[11]

3. The defendant also argues that it was error to admit McKinnon's testimony that Santerre said that the victim was "dead and finally out of her life." Defense counsel objected to the prosecutor's question at trial. This statement, like the ones previously discussed, supported the defendant's theory that Santerre "hatched the plot to kill" the victim. Moreover, on cross-examination, defense counsel elicited additional details about Santerre's statements and actions after the victim's death. Even if the judge erred in allowing the statement over defense counsel's objection, we conclude that there was no prejudice. "We are convinced 'that the error did not influence the jury . . . ' and can say 'with fair assurance that the judgment was not substantially swayed by the [alleged] error.' " *Commonwealth* v. *Vinnie,* 428 Mass. 161, 172, cert. denied, 525 U.S. 1007 (1998), quoting *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994).

4. The defendant posits that McKinnon's testimony regarding a conversation in the car on the night of January 26, 1996, was

---

[11]The defendant's brief also states that it was improper to admit McKinnon's testimony that Santerre "claim[ed] to be happy that [the victim] was gone." However, that testimony was elicited on *cross-examination,* when defense counsel asked whether "[Santerre] said that she was glad to see [the victim] out of the way?" McKinnon answered, "Yes."

incompetent because McKinnon did not identify who was speaking.[12] The judge allowed the testimony under the joint venture exception to the hearsay rule. There was no error. To the extent that McKinnon's testimony was unclear, it was not necessary to establish premeditation or guilt, and did not otherwise prejudice the defendant. Moreover, any ambiguities as to who made the statements bolstered the defendant's strategy to shift blame to Santerre and McKinnon.

C. *Joint venture.* The defendant alleges that the judge erred by failing to instruct that the jury could consider Santerre's alleged statements against the defendant only if the jury determined from other evidence that a conspiracy or joint venture existed, and that the defendant was a member of it. The defendant specifically requested that the judge *not* give an instruction on joint venture liability, and never requested an instruction on the joint venture exception to the hearsay rule.[13] Indeed, the defendant benefited from the judge's decision because had a joint venture instruction been given, it would

---

[12]We find only three such occasions during direct examination: (1) in response to the prosecutor's question whether Santerre and the defendant talked about "a particular location in the house where it was going to happen," McKinnon testified that "they" talked about doing it in the defendant's bedroom "[b]ecause that way [the defendant] could lure [the victim] up there"; however, McKinnon clarified on cross-examination that Santerre was the person who suggested that the defendant "lure" the victim to the bedroom; (2) McKinnon testified that she asked Santerre and the defendant if "they were serious," about the plan, and "[t]hey said no, they weren't; that it was [Santerre's] sister, and they couldn't do it"; (3) McKinnon testified that "we drove" to a State park in Townsend, but "[t]here [were] no good spots." The defendant did not object to any of these statements at trial.

[13]THE JUDGE: "I really don't think it's necessary to charge on joint venture because the defendant is being charged in this particular case for his own actions because it's the Commonwealth's theory that it was by his hand and not the hand of anyone else that the victim was killed in this particular case. So it's not my intention to even get into charging on joint venture. What do you say about that?"

DEFENSE ATTORNEY: "I agree completely, Your Honor."

". . .

THE PROSECUTOR: "I agree with the Court's analysis of the Commonwealth's case. However . . . [t]his was two people involved in this, and I've argued that in my opening and throughout the case. There's evidence of involvement, there's evidence of statements being made, offered against the defendant during the course of the conspiracy, the joint venture, that the jurors heard . . .

have been difficult for the defendant to separate himself from any "bad light" cast on Santerre. See *Commonwealth* v. *Soares*, 384 Mass. 149, 159 (1981) ("the statement of one coconspirator made during the course of the conspiracy and in furtherance of it is admissible against other conspirators despite their absence at the time of the statement"). We assume without deciding that the only basis for admitting Santerre's statements was the joint venture exception to the hearsay rule. However, where the statements focused on Santerre's anger toward the victim, those statements supported the defendant's own theory. In these circumstances, we conclude that the lack of a jury instruction concerning the joint venture exception to the hearsay rule did not create a substantial likelihood of a miscarriage of justice.

D. *Cumulative effect of alleged errors.* The defendant suggests that he was prejudiced by the cumulative effect of the above-mentioned errors. He argues that a "significant amount of highly prejudicial material was admitted at trial that should have been excluded." This argument is without merit, especially considering that the defendant benefited from all the alleged errors. The defendant used his statement to the police to argue that the murder was not premeditated, but instead happened in the midst of a physical altercation. Additionally, the defendant utilized the testimony concerning the victim's sexual relationships, and Santerre's feelings toward her sister, to support the theory that Santerre and McKinnon had motive to kill the victim, that they plotted to kill the victim, and that they pressured the defendant to partake in their plan. Considering all the evidence against the defendant and the defendant's strategy at trial, we are confident that the jury's verdict would have been the same absent all the alleged errors.

E. *Motion for a new trial.* In his motion for a new trial, the defendant claimed that he was deprived of exculpatory evidence.

---

Santerre making. . . ."

THE JUDGE: "Well, I see nothing wrong or inconsistent with your arguing that there were two people involved in this particular situation . . . . [Defense attorney], do you want a charge on joint venture or do you want nothing said about joint venture?"

DEFENSE ATTORNEY: "Your Honor, the defendant prefers that nothing be said about joint venture."

The alleged exculpatory evidence was a letter that Michaud claimed his girl friend, McKinnon, wrote to him while the defendant was on trial. Michaud could not remember what the letter said, but he recalled that it said "something to the effect of 'I did what I had to do and that's why we did what we did.' " Based on the context of the letter, Michaud believed that the letter referred to the victim's death, and therefore he claimed that he immediately gave the letter to the police. The Commonwealth submitted five affidavits from employees of the district attorney's office, State police, and Groton police, averring that they never received such a letter, and no such letter was in their respective files. A judge other than the trial judge, denied the motion without a hearing. The defendant filed a notice of appeal, but has not pursued this argument in his brief.

Based on the affidavits, it was reasonable for the judge to conclude that the letter did not exist, or that if it did, the alleged statement was so vague and cryptic that it was not exculpatory. See *Commonwealth* v. *Pisa,* 372 Mass. 590, 595 (1977), citing Rule 7-1.1[c] and Rule 2-3.11[a] of the ABA Pattern Rules of Court and Code Provisions [rev. ed. 1976] ("Exculpatory evidence is that evidence which tends to 'negate the guilt of the accused' . . . or, stated affirmatively, 'supporting the innocence of the defendant' "). Therefore we conclude that there was no error in denying the defendant's motion for a new trial.

III. *Review under G. L. c. 278, § 33E.*

We have reviewed the entire record, the transcripts, and the briefs and see no reason to reduce the murder conviction or order a new trial.

*Judgment affirmed.*

*Order denying motion for
a new trial affirmed.*