COMMONWEALTH *vs.* ROBIN A. RAPOSA.

Bristol. October 10, 2003. - January 15, 2004.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Waiver of constitutional rights, Admissions and confessions. *Evidence,* Admissions and confessions, Relevancy and materiality, Hearsay. *Waiver. Joint Enterprise. Practice, Criminal,* Argument by prosecutor, Instructions to jury, Capital case.

Evidence at a pretrial hearing on a criminal defendant's motion to suppress supported a Superior Court judge's findings and conclusion that the defendant made a valid oral waiver of her Miranda rights despite her refusal to sign a Miranda rights form, where she knowingly, intelligently, and voluntarily agreed to answer questions about her husband's murder [688]; likewise, the other grounds offered to support the motion to suppress were unavailing, in that the police ceased questioning the defendant when she asked to speak to her attorney [688-689], and there was no substantial likelihood of a miscarriage of justice where the defendant was orally informed of her statutory right to a telephone call [689].

This court concluded that there was no error in a Superior Court judge's admission in evidence of statements made by a joint venturer after the murder with which the defendant was charged, where the Commonwealth laid a proper foundation for the evidence as a statement made in furtherance of concealing the joint venture. [689-691]

At the trial of indictments for murder in the first degree, a Superior Court judge properly admitted in evidence during the prosecutor's cross-examination of the defendant sexually explicit portions of a letter that the defendant wrote to a joint venturer, where such evidence was relevant and admissible to prove a sexual relationship between the defendant and the joint venturer (and thus to establish the defendant's motive to kill her husband) and to impeach the defendant's testimony that she had never had a sexual relationship with the joint venturer and had no motive to kill her husband, and where the vulgar language of the letter was not likely to have cast the defendant in such an unfavorable light with the jury as to be unfairly prejudicial [691-692]; likewise, because the prosecutor's confrontation of the defendant with a box of "smut" letters she had previously written to others was a limited and appropriate response to the defendant's testimony, there was no error [692].

In a criminal case, a Superior Court judge properly excluded inadmissible hearsay evidence consisting of statements made by one of the defendant's neighbors to the police that he had seen the victim alive and doing yard work after the time at which the defendant allegedly confessed to the killing. [692-694]

A prosecutor's statements in his closing argument that, under the defendant's theory, all of the prosecution's witnesses were lying did not improperly inject the prosecutor's own credibility or personal beliefs into the trial [694-695]; further, there was no impropriety in the prosecutor's description of the defendant's actual testimony regarding "smut" letters the defendant wrote [695]; other comments the prosecutor made concerning the manner of the victim's death were supported by the evidence [695-696]; and none of the prosecutor's challenged remarks improperly appealed to the passions and prejudices of the jury so as to create a substantial likelihood of a miscarriage of justice [696]; moreover, there was no merit to the defendant's claim that the prosecutor's comments constituted improper vouching for the testimony of two Commonwealth witnesses [696-697], and the prosecutor did not improperly impugn the integrity and character of defense counsel by suggesting that he was tricking the jury with his advocacy skills [697].

This court reiterated its holding that a criminal defendant is not entitled to a jury instruction on unanimity regarding the factors set forth in *Commonwealth* v. *Cuneen*, 389 Mass. 216 (1983). [698]

INDICTMENTS found and returned in the Superior Court Department on December 17, 1998.

A motion to suppress evidence was heard by *John A. Tierney*, J., and the cases were tried before *Catherine A. White*, J.

*Donald A. Harwood* for the defendant.

*Kevin Connelly*, Assistant District Attorney (*John Moses*, Assistant District Attorney, with him) for the Commonwealth.

CORDY, J. A jury found the defendant guilty of conspiring to murder her husband and murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal she contends that (1) her motion to suppress the statements she made to police should have been allowed; (2) statements made by her alleged joint venturer as well as a sexually explicit letter she wrote to him while awaiting trial were improperly admitted in evidence; (3) testimony from a witness that would have been helpful to her case was wrongly excluded from evidence; (4) the prosecutor's closing argument was improper and prejudicial; and (5) the judge's instruction regarding the *Cunneen* factors was deficient in not requiring unanimity as to any of them. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-229 (1983). We affirm the defendant's convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* We recite the facts in their light most favorable to the Commonwealth, reserving some details for discussion in conjunction with the issues raised. See *Commonwealth v. Gaboriault*, 439 Mass. 84, 85 (2003). At approximately 2:50 P.M. on September 6, 1998, the defendant told her neighbors that someone had shot her husband, Robert Raposa (Robert). Police found Robert dead, with blood on his face, arms, and upper body, on the floor of a trailer behind the home he shared with the defendant and their daughter on Varley Street in Fall River. The medical examiner's office subsequently determined the cause of Robert's death to be two gunshot wounds and a blunt force injury to his head; Robert also sustained two parallel cuts behind his right ear, consistent with injury by knife or blade. The time of death was estimated to be between noon and 3 P.M.

The evidence of the defendant's premeditation and of her motive for involvement in the murder was substantial. In the months leading up to Robert's death, the defendant had been having an affair with Jason Reynolds, a nineteen year old man who had moved into the Raposas' home in June, 1998. She had repeatedly told acquaintances that her relationship with Robert was "tenuous," that she wished Robert were dead, that she would be better off if he were dead, that she was tired of paying Robert's heroin debts, that she was angry at Robert for taking her spot in a heroin treatment clinic, that she intended to find a "real man," that she wanted to kill Robert, that she intended to "blow his F'ing head off," and that she had paid someone to "put him down."

At approximately 1:30 P.M. on the day of the murder, before alerting her neighbors to Robert's apparent demise, the defendant arrived at the home of Kim Oliveira, a woman whom she had recently taken into her confidence and befriended.[1] She told Oliveira that she had used a hammer to hit Robert twice on

---

[1]Oliveira met the defendant approximately three weeks before Robert's murder. Between their meeting and Robert's death, Oliveira saw the defendant almost every day and they became close friends. Oliveira, who had a child with attention deficit disorder, believed that the defendant could provide assistance because the defendant was a special needs teacher. The defendant also loaned Oliveira rent money and heroin, and the two of them began "snorting" heroin together.

the back of the head, and had then shot him.[2] She asked
Oliveira to go for a ride with her to the water and to help her
find a place to dispose of the weapons. They drove to Dighton
Landing on the Taunton River, where the defendant threw the
weapons (a rifle and a ball peen hammer), wrapped in cloth,
into the water. She also asked Oliveira to confirm an alibi for
her by telling the police that they had been together from 12:30
to 2:30 p.m. on that day. Oliviera agreed and conveyed this false
alibi to the police when they interviewed her early on in their
investigation.

Later that same evening, after Robert's body had been found,
the defendant told friends that a police officer had informed her
that Robert was beaten with a hammer but "wouldn't go down,
so they shot him in the temple," and that Robert had been shot
twice in the head.

On October 2, the defendant was arrested for Robert's murder.
In an interview with police following her arrest, the defendant
denied any involvement in her husband's murder, denied that
there had been a romantic relationship between herself and
Reynolds, and (contrary to what she had told her friends on
September 6) told the officers that she had only become aware
that her husband was shot twice in the head after the autopsy
was performed on September 8.

In January, 2000, while the case was awaiting trial, Oliveira
came forward and told police that the defendant had admitted
her involvement in the murder, and that she had helped the
defendant dispose of the weapons. She also told police that
Reynolds had admitted to her that he was the one who actually
shot Robert. After Oliveira came forward, police searched the
area at Dighton Landing, and found a ball peen hammer in the
water. They also learned that a passerby had previously
discovered a .22 caliber rifle in the water in that same area, and
had turned in the weapon to the Dighton police station. The
rifle was located and identified as the same rifle that Reynolds
had borrowed from a friend just prior to the murder. Forensic
evidence linked bullets taken from Robert's head to .22 caliber
ammunition that was discovered missing also just prior to the

---

[2]The defendant also told Oliveira that in the course of assaulting her
husband, she told him that he was not the father of her daughter.

murder from a box owned by another of Reynolds's friends. At trial, the prosecution maintained that the defendant, either alone or as a joint venturer with Reynolds, murdered Robert.[3]

2. *Discussion.* a. *Motion to suppress.* The defendant contends that the motion judge erred by failing to suppress the statement she made to police on October 2, 1998.[4] Where, as here, the evidence before the motion judge consisted primarily of oral testimony, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980). Although we independently review the motion judge's application of constitutional principles, we accept his findings of fact absent clear error, and grant substantial deference to his ultimate conclusions. *Commonwealth* v. *Jones,* 439 Mass. 249, 254-255 (2003).

The motion judge found that the defendant, a thirty-six year old college educated part-time substitute teacher, was given Miranda warnings on October 2, 1998, and that she knowingly, intelligently, and voluntarily agreed to answer questions about her husband's murder. Although the defendant refused to sign the Miranda rights form (as well as refusing an offer to have the interview recorded), this did not preclude the motion judge from finding that a valid waiver of Miranda rights occurred. See *Commonwealth* v. *Ortiz,* 435 Mass. 569, 577 (2002). Here, the testimony of Sergeant John DeMello of the Fall River police and Detective Ronald Blais of the State police at the motion hearing supports the judge's findings and conclusion that there was a valid oral waiver.

The defendant's further claim that the interviewing officers

---

[3]Reynolds was tried separately in a subsequent trial. He was found not guilty of murder, but pleaded guilty to conspiracy to commit murder.

[4]The defendant had had a number of discussions with the investigating officers prior to her arrest on October 2, in the course of which she suggested that the police investigate several different individuals for possible involvement in her husband's murder. The defendant's motion to suppress sought to exclude all of the statements she made to police, both before and after her arrest. On appeal, she argues only that her postarrest statement should have been suppressed. We have examined the circumstances attendant to her other statements pursuant to our obligation under G. L. c. 278, § 33E, and find no error in the judge's ruling denying the motion to suppress them.

were aware that the defendant was represented by counsel on another matter (and presumably should not have interviewed her without his presence) is unavailing, where the police questioning stopped as soon as she asked to speak to her attorney.

The defendant finally contends that her statement should be suppressed because she was not advised of her right to make a telephone call in violation of G. L. c. 276, § 33A. See *Commonwealth* v. *Jones*, 362 Mass. 497, 502-503 (1972). The defendant did not include this ground as a basis for suppression either in her written motion or in her affidavit, nor does it appear from the record that this argument was otherwise raised before the motion judge. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979). Consequently the judge made no specific findings with regard to it. We consider the matter only for the purpose of ascertaining whether there is a substantial likelihood of a miscarriage of justice. Based on our review of the testimony given at the hearing, we can safely conclude that there is no such likelihood here. The testimony amply supports a finding that the defendant was orally informed of her statutory right.[5] There was no error.

b. *Admission of Reynolds's statements.* The defendant contends that the judge erroneously admitted in evidence statements made by Reynolds after the murder. We conclude there was no error. "It is well settled that out-of-court statements by joint criminal venturers are admissible against the others if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). Although this exception to the hearsay rule "does not apply [to statements made] after the criminal enterprise has ended . . . [it]

---

[5]At the hearing, Detective Blais testified on cross-examination that the defendant was given a Miranda rights form that included a notice advising her of her right to make a telephone call. When confronted with the form itself, Blais admitted that it did not, in fact, include such a notice; on redirect, Blais corrected himself, stating that he believed that Sergeant DeMello orally informed the defendant of her telephone rights. Sergeant DeMello confirmed in his testimony that he offered the defendant the opportunity to use the telephone, and that she declined.

does apply where the joint venturers are acting to conceal the crime that formed the basis of the enterprise." *Commonwealth v. Angiulo*, 415 Mass. 502, 519 (1993).[6] In this case, the Commonwealth laid a proper foundation for the admission of Reynolds's statements by introducing evidence independent of the statements, sufficient to demonstrate that after Robert's murder the defendant and Reynolds continued to cooperate in an effort to conceal their involvement in his death. That foundation included evidence that Reynolds paged the defendant shortly after Robert's death, that the defendant disposed of the rifle that Reynolds had borrowed and that the jury could have concluded was used in the murder, and that Reynolds and the defendant together contacted the police to discuss the case.

The principal statement about which the defendant complains was made by Reynolds to Oliveira two or three days after the murder, in which he told her that he, not the defendant, had shot Robert, and intimated that he knew the location of the murder weapons. At the time of this conversation, Oliveira had both provided the defendant with a false alibi for the time of Robert's death and had heard the defendant's confession to killing Robert. To evade detection, the defendant and Reynolds needed to ensure that Oliveira did not report the truth to the police. Reynolds's statement to Oliveira furthered this goal by continuing and deepening the relationship that the defendant, Reynolds, and Oliveira shared; consequently, it was properly admitted in evidence.[7] The judge also admitted several exculpatory statements that Reynolds made to police after Robert's death in an attempt to divert their attention from himself and

---

[6]Such statements are similarly admissible if made in the course of and in furtherance of a conspiracy. *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 248 (2000).

[7]At the time the statement was admitted in evidence, the judge instructed the jury that they could only consider it as evidence against the defendant if they found beyond a reasonable doubt that Reynolds and the defendant were engaged in a joint venture, and that the statement was made in the course of and in furtherance of the joint venture, including in furtherance of concealing the joint venture. See *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993). The judge similarly instructed the jury in the alternative that they could consider the statement if it was made in furtherance of the alleged conspiracy. See *Commonwealth* v. *McLaughlin, supra*.

the defendant. These statements also served the defendant and Reynolds's joint goal of evading detection, by misleading the detectives investigating Robert's death. There was no error.

c. *Admission of the defendant's letter to Reynolds.* The defendant contends that the judge erred by admitting sexually explicit portions of a letter that the defendant wrote to Reynolds while both were in custody awaiting trial. The evidence was admitted during the prosecutor's cross-examination of the defendant.[8] The sexually explicit language in the letter was relevant and admissible for two related purposes. First, it tended to prove a sexual relationship between the defendant and Reynolds and was, therefore, relevant on the issue of her motive to kill her husband. See, e.g., *Commonwealth* v. *Burke*, 339 Mass. 521, 533 (1959), rev'd on other grounds, *Commonwealth* v. *Beldotti*, 409 Mass. 553, 562 n.6 (1991) ("Evidence that one accused of killing his wife has formed an attachment for another woman may form the basis of an inference that the accused entertained feelings of hostility toward his wife"). Second, it was relevant to impeach the defendant's testimony that she had never had a sexual relationship with Reynolds and had no motive to kill her husband.

Nonetheless, the defendant contends that the sexually explicit language in the letter should have been excluded because it was highly prejudicial. The judge, within his sound discretion, must consider whether the probative value of evidence is outweighed by its potential prejudice. The decision of the judge to admit evidence will be upheld on appeal absent palpable error. See, e.g., *Commonwealth* v. *Gollman*, 436 Mass. 111, 114 (2002). In this case, there was no error. The probative value of this language was high because it demonstrated the physical, sexual nature of the relationship between the defendant and Reynolds, a contested issue in the case directly related to motive and premeditation. Although the letter's language was vulgar, it was

---

[8] The circumstances surrounding the admission of the sexually explicit portions of the letter were unconventional. The judge ruled that the letter was admissible but reserved the right to remove or redact some of it, concerned that it might be overly prejudicial. Before the judge ruled on the admissibility of the sexually explicit language in the letter, the prosecutor read that language aloud when confronting the defendant in cross-examination. The judge ultimately allowed the letter in evidence in its entirety.

not likely to have cast the defendant in such an unfavorable light with the jury as to be unfairly prejudicial. This is not one of "those rare instances in which the probative value of the evidence is overwhelmed by its inflammatory potential." *Commonwealth* v. *Repoza*, 382 Mass. 119, 128 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987).

The defendant further complains that the prosecutor compounded the prejudice when, during further cross-examination, he confronted her with a box of "smut" letters that she had previously written to others. Because the use of these letters was a limited and appropriate response to the defendant's testimony, there was no error. The following context leads us to this conclusion. When confronted by the prosecutor with her letter to Reynolds, the defendant denied writing the sexually explicit parts, claiming that it was part of a game she was taunted into by other detainees, that they had written those parts, and that she had never written a "smut" letter. In response, the prosecutor marked a "big pile" of letters for identification and offered one such letter in evidence, without objection from defense counsel. He then asked the defendant to read the admitted letter to the jury, triggering an objection from defense counsel. After a sidebar conference at which the judge excluded the letters from evidence, the prosecutor asked the defendant whether the letter refreshed her recollection "as to whether or not [she] would ever put smut in a letter," and, subsequently, whether she used "smut" in letters. She then admitted that she had used such language in other letters. The prosecutor's line of questioning was entirely proper in these circumstances, and the use of the letters was properly limited by the judge.

d. *Exclusion of Alfred Paulo's testimony.* At trial, the defense sought to introduce the testimony of Alfred Paulo, a neighbor of the Raposas. On voir dire, Paulo testified that he did not see Robert on the day Robert was killed; however, the defendant intended to call Paulo and impeach him with a prior statement he apparently made to the police to the effect that he had seen Robert alive and doing yard work between 2 and 2:30 in the

afternoon,[9] after the time at which the defendant allegedly confessed to Oliveira. The judge excluded Paulo's testimony.

Paulo's out-of-court statement to the police was hearsay, and the defendant has not shown that it is admissible under any exception to the hearsay rule. On the basis of Paulo's voir dire testimony the judge properly concluded that if called, Paulo would offer no testimony relevant to any issue being tried, and therefore he could not be called solely for the purpose of being impeached by a prior inconsistent statement that was otherwise inadmissible. *Commonwealth* v. *Evans*, 439 Mass. 184, 193 (2003). Moreover, there is no evidence to suggest that Paulo's statement to the police was so trustworthy that its exclusion offended the defendant's right to present a defense. See *id.*; *Commonwealth* v. *Evans*, 438 Mass. 142, 156 (2002).[10]

At trial, the defendant also argued that she had a right to present Paulo's testimony under *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980), because Paulo's testimony was relevant to the adequacy of the police investigation in the case. As we have noted repeatedly, *"Bowden* simply holds that a judge may not remove the issue [of the adequacy of the police investigation] from the jury's consideration." *Commonwealth* v. *Williams*, 439 Mass. 678, 687 (2003), quoting *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003). While *Commonwealth* v. *Bowden*, *supra* at 485-486, preserves a defendant's right to attack the adequacy

---

[9]During his voir dire testimony, Alfred Paulo initially said that he remembered giving that detail in his statement to police, then claimed that he only remembered "talking to the police."

[10]The defendant claims that the exclusion of Paulo's testimony violated her right to present a full defense because the testimony was of a "crucial nature," and "would have completely 'gutted' the Commonwealth's case." While we doubt that the introduction of a recanted statement of an elderly neighbor concerning only the time at which the victim was last seen alive would have "gutted" the case against the defendant, we note more importantly that it is the *reliability* of hearsay evidence — not its importance to the defense — that is the touchstone of our analysis in full-defense cases. See *Commonwealth* v. *Evans*, 439 Mass. 184, 193 (2003) (criticizing defendants' failure to show that "[a potential defense witness's] statement to police was so *reliable and trustworthy* that, although hearsay, its exclusion might offend their constitutional right to present a defense" [emphasis added]); *Commonwealth* v. *Evans*, 438 Mass. 142, 156 (2002) (finding no "constitutional right to the admission of *unreliable* hearsay" [emphasis added]); *Commonwealth* v. *McAfee*, 430 Mass. 483, 491 n.3 (1999).

of the police investigation, that attack is still constrained by the rules of evidence. Nothing in the *Bowden* case authorizes a defendant to introduce otherwise inadmissible hearsay.

e. *The Commonwealth's closing argument.* The defendant raises a series of objections concerning the propriety of the prosecutor's closing argument. "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Rodriguez,* 437 Mass. 554, 565 (2002), quoting *Commonwealth* v. *Lamrini,* 392 Mass. 427, 432 (1984).

Four times during his closing argument, the prosecutor argued that, under the defendant's theory, all of the prosecution witnesses were lying. The final such claim drew an objection from defense counsel. In *Commonwealth* v. *Thomas,* 401 Mass. 109 (1987), we found that a prosecutor's closing argument improperly "inject[ed] the prosecutor's own credibility as well as his personal beliefs into the case," *id.* at 115, when the prosecutor argued that to convict the defendant, the jury would have to disbelieve a number of prosecution witnesses, thereby implicating the prosecutor himself in a "a conspiracy to convict an innocent person." *Id.* at 114. In this case, the prosecutor's specific comments were (1) "Because actually, folks, when it comes right down to it, it's either [the defendant] is lying, or everyone else who testified in this case is lying"; (2) "You've heard from many witnesses, and again they all have to be lying or mistaken or God knows what for it to be any other way"; (3) "[Defense counsel] wants you to believe oh, all a mistake or they're lying"; and (4) "Oh, all these people are lying except for [the defendant]." These comments do not inject the prosecutor's own credibility or his personal beliefs into the case, nor do they suggest that the "only possible explanation" of the testimony was either that the Commonwealth's witnesses "were completely truthful and accurate or that they *conspired to perpetrate* a gross lie" (emphasis added). *Id.* at 116. Rather, they suggest either that the witnesses were truthful in relevant respects or that each of them, individually, was lying or mistaken. The comments do not implicate the concerns of *Commonwealth* v. *Thomas, supra.* "Where credibility is at issue, it

is certainly proper for counsel to argue from the evidence why a witness should be believed." *Id.*

The defendant also contends that the prosecutor improperly referred to the excluded box of "smut" letters allegedly written by the defendant. As we repeatedly have held, a "prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." *Commonwealth* v. *Pearce*, 427 Mass. 642, 646 (1998), quoting *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994). Here, however, the prosecutor's comment was not a reference to excluded evidence, but rather a description of the defendant's actual testimony: "And then when she's on the stand, she tells you folks, oh, she would never put smut in a letter. . . . Under oath she tells you that. And then I show her a box of letters, and then all of a sudden her memory gets better. This woman will not tell the truth unless she's got no way but to admit it." This statement accurately describes the prosecutor's use of the box of letters to refresh the defendant's recollection as to whether she uses sexually explicit language in letters. There was no impropriety.

Additional remarks by the prosecutor about which the defendant complains concerning the manner of Robert's death were also supported by the evidence. The prosecutor's argument that the defendant "took [a knife] and sliced his ear and sliced his ear and darn near cut his ear off" was proper, as it is a reasonable inference from the defendant's confession to Oliveira that she killed her husband and autopsy evidence indicating that Robert's ear had been cut. See *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993) ("inferences suggested by the prosecutor need only be reasonable and possible and need not be necessary or inescapable"). His argument that Robert "had time to stew before he was killed" was supported directly by Oliveira's testimony that the defendant told her that first she hit Robert with a hammer, then spoke to him, and finally shot him. Finally, the prosecutor's argument that the defendant may have been "reliving a fond memory" when she demonstrated to friends "how [Robert] put the [bloody] rag on the back of his head" during the assault was supported by the testimony of several people who saw the defendant's demonstration as well

as Oliveria's testimony that the defendant admitted striking Robert in the head with the hammer.

The defendant further contends that several of the prosecutor's remarks improperly appealed to the passions and prejudices of the jury. We find no error. The prosecutor at one point referred to Reynolds as the defendant's "boy toy," an obvious reference to the sexual relationship and difference in age between the defendant and Reynolds. Because the defendant made no objection to this comment at trial, "we consider the asserted error to be of significance only if it created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Maynard*, 436 Mass. 558, 570 (2002). While perhaps inelegant and unnecessary, this comment, in the context of the arguments and the case as a whole, see *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), cannot be said to have had such an effect on a jury as to create a substantial likelihood of a miscarriage of justice. Similarly, the jury would certainly recognize the prosecutor's references to the defendant's having her "tentacles" around Oliveira, and asking nothing from Oliveira in return except for her "soul" as nothing more than perhaps overly dramatic figures of speech.[11] See *Commonwealth* v. *Anderson*, 411 Mass. 279, 287 (1991) (noting that jury have "the capacity to discount hyperbole").

The defendant next claims that the prosecutor's comments constituted improper vouching for the testimony of two of its witnesses. This claim is also without merit. A prosecutor is permitted "to point to reasons why a witness's testimony, or portions of a witness's testimony, should logically be believed." *Commonwealth* v. *Rolon*, 438 Mass. 808, 816 (2003), but "may not explicitly or implicitly vouch to the jury that he or she knows that the witness's testimony is true." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989). In this case, the prosecutor stated, "Mrs. Pacheco, one of the nicest people, and I suggest

---

[11]Describing the defendant's relationship with Oliveira, the prosecutor stated: "And there's Kim Oliveira. [The defendant] befriends her. . . . Grabs onto her. And she gives her money for rent. Can't you just see her tentacles just grabbing onto Kim? Money for rent, pager, and . . . she gives her heroin. Free. She doesn't want anything in return. Except maybe her soul."

to you about as forthright — I know it was a long time ago, folks. I know it was two and a half weeks ago or two weeks ago that she was up here on the stand." While standing alone, a claim that a witness is "one of the nicest people, and I suggest to you about as forthright" might constitute improper vouching, in context the prosecutor's comment here clearly constituted an invitation to the jury to think back to the witness's demeanor on the stand, along with a suggestion that her demeanor supported the credibility of her statements. The prosecutor's further comment regarding Oliveira, to the effect that, when she came forward to police, "her pastor was there" was also within proper bounds. The statement came in the context of the prosecutor's explanation, based on the evidence, why Oliveira initially lied to police, then came forward with the truth; it was accompanied by the claim that Oliveira had stopped using drugs when she came forward, and that coming forward "takes a certain amount of courage." In context, these statements were part of a proper argument.

The defendant finally claims that the prosecutor improperly impugned the integrity and character of defense counsel by suggesting that he was tricking the jury with his advocacy skills. Specifically, the prosecutor stated, "I mean, thank goodness you folks have notes, if I was sitting there listening to [defense counsel] tell you what the evidence was. Thank goodness you have the notes, because it's not what [defense counsel] tells you the evidence is."[12] The prosecutor went on to characterize defense counsel as an attorney able to "spin gold from straw." Our cases have upheld the use of language of this nature. See, e.g., Commonwealth v. Maldonado, 429 Mass. 502, 508-509 & n.4 (1999) (finding permissible prosecutor's statement that jury "can take the path to seek the truth or you can take the path that [defense counsel] has paved for you this morning. One riddled with smoke screens, one smoke screen designed to try to deter you from your mission of finding the truth"). There was nothing improper in the prosecutor's remarks.

---

[12]Defense counsel made a similar argument about the jury's ability to take notes, although he focused on witness credibility rather than the opposing counsel's argument: "And thank goodness we have notes . . . maybe you have a note in there this person got nervous at that point, or anything that can help you judge credibility."

f. *Jury charge on the* Cunneen *factors.* Citing *Richardson* v. *United States*, 526 U.S. 813 (1999), and *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), the defendant argues that she was entitled to a jury instruction requiring unanimity as to the *Cunneen* factors for assessing whether a murder was committed with extreme atrocity or cruelty.[13] See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-229 (1983). In *Commonwealth* v. *Obershaw*, 435 Mass. 794 (2002), we held that, even in light of the *Richardson* and *Apprendi* cases, a defendant is not entitled to a *Cunneen* unanimity instruction. *Commonwealth* v. *Obershaw, supra* at 809 & n.5. The defendant invites us to overturn the *Obershaw* case; we decline to do so.

g. *G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and we find no reason to exercise our power to reduce the jury's murder verdict or order a new trial.

*Judgments affirmed.*

---

[13]At trial, defense counsel explicitly noted that he had no objection to the charge concerning the factors delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), so we consider only whether the failure to instruct on unanimity creates a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Jiles*, 428 Mass. 66, 71 (1998).